IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 12, 2010 Session

**JERRY L. FOX v. JANET E. FOX**

**Appeal from the Chancery Court for Bedford County**
**No. 26454      J.B. Cox, Chancellor**

**No. M2009-02341-COA-R3-CV - Filed March 24, 2011**

In a divorce action, Wife argues that the trial court erred in the amount of its award of periodic alimony and in failing to order Husband to pay her attorney fees. We find that Wife's periodic alimony should be increased to $3,000 per month. We also find that the trial court did not abuse its discretion in declining to award Wife attorney fees.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Stephen Walker Pate, Murfreesboro, Tennessee, for the appellant, Janet E. Fox.

John Richardson White, Shelbyville, Tennessee, for the appellee, Jerry L. Fox.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

The parties, Jerry L. Fox ("Husband") and Janet E. Fox ("Wife"), were married in 1991. Husband filed for divorce on August 9, 2006, alleging irreconcilable differences and inappropriate marital conduct. Wife answered and filed a counter-complaint on August 30, 2006, alleging irreconcilable differences and inappropriate marital conduct.

A trial was held May 28-29, 2009. On June 12, 2009, the court entered its order declaring the parties divorced based upon stipulated grounds in accordance with Tenn. Code Ann. § 36-4-129(b). Husband was designated the primary residential parent of the parties' minor child, and Wife was ordered to pay $521.75 per month in child support, based on

imputed income of $29,300. Wife was awarded the bed and breakfast owned and operated by the parties, valued at $165,000, and Husband was awarded real property valued at $65,000. The court awarded Wife periodic alimony in the amount of $1,000 per month until her death or remarriage. Both parties were ordered to pay their own attorney fees.

A hearing was held on August 21, 2009, on Wife's motion to alter or amend. The court denied Wife's request for a modification of alimony and attorney fees. However, the trial court reduced Wife's child support obligation to $215.00 per month.

STANDARD OF REVIEW

We review a trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). We review questions of law de novo with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

ANALYSIS

On appeal, Wife argues that the trial court erred in the amount of its award of periodic alimony and in failing to order Husband to pay her attorney fees.

Alimony

A trial court has broad discretion to determine the need for spousal support, as well as the appropriate nature, amount, and duration of that support. Tenn. Code Ann. § 36-5-121; *Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004). As such, an award of spousal support will not be disturbed on appeal absent an abuse of the trial court's discretion. *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). "Appellate courts are generally disinclined to second-guess a trial judge's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes." *Kinard v. Kinard*, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998). Our review of the court's findings of fact is de novo upon the record accompanied by a presumption of correctness. Tenn. R. App. P. 13(d); *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000).

Decisions regarding the nature and amount of spousal support hinge upon the unique facts of each case and require careful consideration of the factors found at Tenn. Code Ann. § 36-5-121(i).[1] *Oakes v. Oakes*, 235 S.W.3d 152, 160 (Tenn. Ct. App. 2007). The single

---

[1] Tenn. Code Ann. § 36-5-121(i) instructs the court to consider all relevant factors in determining
(continued...)

most important consideration for the court in awarding alimony is the need of the disadvantaged spouse seeking support, followed by the ability of the obligor spouse to pay support. *Id.* Tennessee law provides four different types of alimony that may be appropriate in combination or alone: rehabilitative alimony, alimony in futuro (also known as periodic alimony), transitional alimony, and alimony in solido (also known as lump sum alimony). Tenn. Code Ann. § 36-5-121(d)(1).

---

[1](...continued)
whether spousal support is appropriate and in determining the nature, amount, length of term, and manner of payment, including the following:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

The trial court in the instant case awarded Wife periodic alimony, or alimony in futuro, of $1,000 per month. Alimony in futuro is "a payment of support and maintenance on a long term basis or until death or remarriage of the recipient." Tenn. Code Ann. § 36-5-121(f)(1). An award of alimony in futuro is appropriate where there is "relative economic disadvantage" and rehabilitation of the disadvantaged spouse is not feasible. *Id.* Pursuant to Tenn. Code Ann. § 36-5-121(f)(2)(A), "[a]n award of alimony in futuro shall remain in the court's control for the duration of such award, and may be increased, decreased, terminated, extended, or otherwise modified, upon a showing of substantial and material change in circumstances." In addition, Tenn. Code Ann. § 36-5-121(f)(3) provides that an award of alimony in futuro "shall terminate automatically and unconditionally upon the death or remarriage of the recipient."

On appeal, Wife argues that the trial court erred in awarding her periodic alimony of $1,000 per month and asserts that the amount should be amended to $6,000 per month. Husband insists that the $1,000 per month award is appropriate.

At the time of trial in 2009, Husband was sixty-five. He was self-employed as a home inspector with Ace Building Consultants. According to Husband's income tax returns (Schedule C, titled "Profit or Loss from Business"), he earned profits of $47,312 in 2006, $71,557 in 2007, and $24,034 in 2008. Husband also receives distributions from a family trust, the beneficiaries of which are he and his two brothers. Husband stated that he received no income from the trust prior to 2005. Total distributions from the trust were $190,998 in 2006, $212,792 in 2007, and $182,464 in 2008. Husband testified that income distributions do not reduce the principal of the trust, and he does not anticipate that the trust will be depleted anytime in the foreseeable future.

Wife was fifty-five at the time of trial. She is a college graduate and was employed as a realtor during much of the parties' marriage. Wife was successful as a real estate agent in the Nashville area in the 1990s. Wife's income tax returns reflect profits of $53,140 in 1994 and $74,256 in 1995.[2]

In 1996, the parties purchased a residence in Wartrace, Tennessee. The parties still resided in Davidson County at the time. At trial, Husband stated that they were interested in simplifying their lives, moving into the country, and raising their daughter in a small town. They planned to eventually move into the home in Wartrace and operate it as a bed and breakfast. Husband testified that the parties anticipated a transition period during which Wife would continue to sell real estate but then focus exclusively on the bed and breakfast once it started making enough money. He testified that the plan was for Wife to sell real

---

[2] The parties did not file income tax returns from 1996 to 1999.

estate part-time in Bedford and Rutherford counties thereafter. Husband stated that he expected Wife's income to decline once they started living in Wartrace full-time. Wife gave a slightly different account of the parties' plans. She testified that Husband wanted her to quit working and take care of the kids and manage the bed and breakfast. She also stated that it was his preference that she retire her real estate license. Husband disputed that the plan was for Wife to quit selling real estate and focus exclusively on the bed and breakfast. He testified that that was "left open" and that the parties discussed many possibilities.

Wife began working part-time at the bed and breakfast in 1998 and full-time in 2004. She subsequently surrendered her real estate license.[3] The bed and breakfast was not profitable. According to the parties' income tax returns, the bed and breakfast suffered losses of $22,920 in 2003, $25,000 in 2004, $7,213 in 2005, $1,241 in 2006, $1,805 in 2007, and $1,278 in 2008. Husband blamed the losses, in part, on Wife's mismanagement of the bed and breakfast. He stated that she kept the rooms in an unclean and cluttered condition and allowed her son, his girlfriend, and their child to live at the bed and breakfast, effectively limiting the number of rooms that could be rented.[4] Husband stated his belief that the bed and breakfast could be profitable with proper marketing, keeping rooms clean, and treating guests well. Husband stated that the bed and breakfast was on track to earn a profit in 2005 when the parties started having marital problems. He stated that Wife "lost interest" at that point. Husband acknowledged that income from the bed and breakfast alone could not support an individual without an outside job.

Wife claims that she can no longer work as a real estate agent because of her diabetes and diabetic neuropathy. Wife testified that she was diagnosed with diabetes in 1999 and diabetic neuropathy a few months later. Wife claims that, as a result of her diabetic neuropathy, she experiences symptoms such as pain, numbness in her hands and feet, the inability to sit or stand for long periods of time, the inability to lift heavy objects, and problems with her vision which sometimes prevent her from driving.

Prior to trial, Dr. Lawrence Schull, a board-certified physician in internal medicine, was deposed on Wife's behalf. Dr. Schull first saw Wife in September 2007. At that time, he diagnosed her with diabetes, hypertension, and elevated cholesterol. He next saw her in April 2008 and diagnosed her with diabetic neuropathy, which he defined as a chronic condition in diabetic patients consisting of damage to the peripheral nerves. He stated that the condition is treatable with medication but is not curable. Dr. Schull stated his belief that

---

[3] Wife testified that the last time she sold real estate was in 2002 and that she retired her license in 2004.

[4] Wife testified that she was the only person living in the bed and breakfast at the time of trial.

Wife has permanent partial disability related to neuropathy, including chronic pain and the inability to stand for any length of time. Dr. Schull stated that one assesses the degree of nerve damage by history-taking, including the patient's own assessment of his/her degree of pain. Dr. Schull stated that there is no record of a nerve conduction study ever having been done on Wife and that he has no objective data as to the severity of the damage. Dr. Schull acknowledged that his finding that Wife suffers from some degree of permanent partial impairment is based solely on subjective reports from Wife and reports by other physicians.

Husband also has some health concerns. He testified that he has heart disease and a stent in the main artery of his heart. He stated that he intends to continue his job as a home inspector, which requires him to climb on roofs and crawl under houses and in attics.

We find the trial court's comments about Wife's medical condition instructive. We give "great weight to a trial court's factual findings that rest on determinations of credibility." *Elliott v. Elliott*, 149 S.W.3d 77, 83 (Tenn. Ct. App. 2004). "[T]he trial court is in a much better position to evaluate the credibility of the witnesses." *Boyer v. Heimermann*, 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007). The trial court acknowledged Wife's alleged medical condition in making its child support determination, but also noted the subjective nature of that diagnosis. The trial court stated the following:

> Hers [income] will be imputed because *her claim of medical condition and the Court's weight of credibility of that, and the lack of fundamental medical proof that relates to objective diagnosis*, and her education and her apparent ability to communicate effectively and to operate a business effectively, if not burdened by the distractions of the divorce, would indicate that she would be able to at least have an income consistent with an earning capacity imputed by the child support guidelines, and I choose to use that as a figure.[5]

(Emphasis added.)

---

[5] For the purposes of child support, the court imputed income to Wife in the amount of $29,300, pursuant to the Child Support Guidelines. In making this determination, the trial court noted the following:

> [I]f there are no distractions in the B and B, which she's choosing to go forward with and she applies her college-educated abilities, at her age, to the running of that business with focus, she can produce income of that level [$29,300] at that business if it is what she believes it is. In the absence of that, she has a Realtors license, which she has the opportunity to use if she takes it out of retirement. And even with her physical limitations, the Court does not view them as such as it would keep her from being a successful affiliate or broker.

The trial court commented on Wife's potential earning capacity. The trial court described Wife as "an extremely bright, well-educated, capable individual." The court further noted, "I am saying that she has the ability to earn money in this matter and a college education, and it's a matter of focus on going forward from this point . . . ." In making its determination with regard to alimony, the trial court noted the following:

> The specter of whether or not this case can bear $6,200 a month in alimony is readily apparent to the Court. It cannot. There's absolutely no way that it can. The issue before the Court is looking at all of the factors. Is there a need, based upon where we are? Yes, there is a need. Is the need of the making of the person who is claiming the need in this instance? To an extent, there is. To an extent there has been the ignoring of the business opportunity for the sake of emotional relationship with family, and for the sake of a perception of deterioration of health in this matter. And in terms of where we are, it ignores the fact that she is an extremely bright, well-educated, capable individual, of an age, that, in our society, has—and Mr. Pate [Wife's counsel] says ten years, I think, and Mr. White [Husband's counsel] says ten years—and I think you-all are both wrong. Even with diabetic issues, I think that there is the potential for her to earn income for a greater period of time than that.
>
> . . . .
>
> Does he out earn her, most especially in light of the Fox Trust? Given her age and her abilities, can she be rehabilitated to earn as much as him, not as much? Will it bear anywhere near what the request is for the purposes of going forward? No, it won't.
>
> The periodic alimony that relates to where they are is consistent with, and relates to, a figure of $1,000 a month for the next seven years,[6] which takes into account her abilities to earn her own and to be able to use the business in a way that it is going to be the most productive.

Our review of the record suggests that the trial court's award of periodic alimony is not supported by the evidence. First, we note the relatively long duration of the marriage—nearly eighteen years by the time of the trial in 2009. Additionally, Husband's

---

[6] After some discussion with counsel about various types of alimony, the court later clarified that its "preference would be that it would be deemed to be periodic [alimony] and remove the seven-year requirement to make sure it's the cleanest under the purposes of the record until her death or remarr[iage], so it will be $1,000 a month."

financial resources, from his home inspection business and his family trust, are significantly greater than Wife's. Wife gave up selling real estate in 2002 and retired her license in 2004 in order to work the bed and breakfast full-time. The outstanding debt on the bed and breakfast, which was awarded to Wife, is approximately $82,000. Wife's monthly payment is $1,028.97. Finally, while the trial court found Wife to be bright, well-educated, and capable, Wife has some physical problems that may impact her ability to work in the future. Taking into account all of the relevant factors, particularly Wife's need and Husband's ability to pay, we conclude that Wife's periodic alimony should be increased to $3,000 per month.

<u>Attorney Fees</u>

Wife argues that the trial court's failure to order Husband to pay Wife's attorney fees is contrary to the weight of the evidence. Wife argues that she was economically disadvantaged and was required to deplete her resources throughout the three-year course of this litigation. Wife claims that she incurred attorney fees in excess of $26,000 with two different attorneys who represented her in this matter.

The award of attorney fees in actions for divorce is considered an award of alimony in solido. Tenn. Code Ann. § 36-5-121(h)(1). Such an award is within the discretion of the trial court. *Keyt v. Keyt*, 244 S.W.3d 321, 334 (Tenn. 2007). A trial court abuses its discretion only when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning or that causes an injustice to the party complaining." *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). "No precise parameters have been set for the exercise of discretion, but, generally, an award of fees should be 'just and equitable under the facts of the case.'" *Evans v. Evans*, No. M2002-02947-COA-R3-CV, 2004 WL 1882586, at *17 (Tenn. Ct. App. Aug. 23, 2004) (quoting *Sherrod v. Wix*, 849 S.W.2d 780, 785 (Tenn. Ct. App. 1992)).

The trial court determined that the parties should be responsible for their own attorney fees. Wife will receive $3,000 per month in alimony for life or until she remarries. Husband was designated the primary residential parent of the parties' only child. Additionally, Wife was largely responsible for the delays in litigation that increased her attorney fees. The record contains Wife's motions for continuances, substitution of counsel, withdrawal of counsel, as well as orders to appear and show cause for failure to obey court orders to undergo a mental evaluation and to produce certain documents. The trial court stated the following in making its ruling: "The concern that I had is the amount of delay and how to attribute that one way or another. And based on the equity that I have set out in the personal property division in this matter, the Court believes that these parties can pay their own attorneys' fees."

We find no abuse of discretion in the trial court's decision with respect to attorney fees.

CONCLUSION

The judgment of the trial court is affirmed in part and reversed in part.  Costs of appeal are assessed against the appellee, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE