IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 30, 2014 Session

# GREG WILLET, AS EXECUTOR OF THE ESTATE OF WALTER TAEUBEL v. LUCY ADELAINE TAEUBEL

**Appeal from the Circuit Court for Hamilton County**
**No. 03D1790     L. Marie Williams, Judge**

**No. E2014-00364-COA-R3-CV-FILED-NOVEMBER 10, 2014**

This appeal involves a petition to terminate alimony *in futuro*. Several years after the parties' divorce, former husband became completely disabled. Former husband filed a petition to terminate his alimony obligation based on a substantial and material change in circumstances. The trial court granted former husband's petition. Former wife appeals, contending that the trial court erred in concluding former husband established a substantial and material change in circumstances. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the Court, in which D. Michael Swiney, J., and KENNY W. ARMSTRONG, J., joined.

Charles G. Wright, Jr., Chattanooga, Tennessee, for the appellant, Lucy Adelaine Dennington Taeubel.

Bruce C. Bailey, Chattanooga, Tennessee, for the appellee, Greg Willet, as Executor of the Estate of Walter Taeubel.

## OPINION

### Facts

The parties, Lucy Adelaine Dennington Taeubel ("Wife") and Walter Taeubel

("Husband"),[1] were divorced on July 27, 2004. Wife was awarded alimony *in futuro* of $1,500.00 per month. Both parties were sixty-seven years old at the time of the divorce judgment and approximately seventy-seven years old at time of trial on the instant matter. They had been married nineteen years, and it was the third marriage for both parties. The parties resided in Hamilton County, Tennessee, at the time of the divorce. The marriage produced no children, although both parties have adult children from previous marriages.

On November 3, 2010, Husband filed his Verified Petition to Modify Support seeking to terminate his obligation to pay alimony to Wife.[2] This petition is the issue of this appeal. Husband averred a significant and material change in circumstances due to a severe stroke he suffered on August 26, 2010. After his August 2010 stroke, Husband suffered several post-stroke seizures. In her answer to the petition, Wife denied that Husband suffered any significant and material change in circumstances. Prior to the stroke, Husband worked full time. By the time of trial on the petition to modify support, Husband was no longer employed. It is undisputed that since suffering the stroke, Husband has become completely disabled. However, he continued to meet his alimony obligation, totaling approximately ten years of alimony paid to Wife. At the time of the divorce judgment, Husband's salary was $6,446.00 monthly. At the time of the petition to modify, Husband's income decreased to $3,563.50[3] monthly, which included payments from Social Security, his pension fund, and a mandatory IRA withdrawal. Husband's assets totaled $343,625.72.[4]

On October 5, 2012, the Hamilton County Chancery Court entered an Order Appointing Conservator for Walter Taeubel. The order appoints Mark Taeubel ("Mark"),

---

[1] Husband's conservator requested this Court take notice of Husband's death, which occurred on July 29, 2014. On September 22, 2014, Greg Willett was substituted as a party as Executor of the Estate of Walter Taeubel in place of conservators Diane Taeubel and Mark Taeubel. The case style became ***Greg Willet, as Executor of the Estate of Walter Taeubel v. Lucy Adelaine Taeubel***. This appeal remains viable for the alimony *in futuro* with respect to the time period between the trial court's January 23, 2014 order that terminated Husband's alimony obligation and the date of Husband's death, July 29, 2014.

[2] Husband's conservators were not substituted as parties until February 3, 2013. In their Motion to Substitute Party Petitioner and to Revise Style of the Case, Husband's conservators state that Husband is incompetent as determined by two medical doctors, general practitioner Dr. Robert Drake and neurologist Dr. Matthew Kodsi.

[3] This amount represents Husband's post-tax net income. Husband's gross income, before taxes, was $3,724.55 per month.

[4] This amount includes $100,000.00 Husband invested in a start-up business, Plant Drives and Systems, in 2010 just before suffering his stroke. Plant Drives and Systems was an ongoing business at the time of trial, but Husband had not received any income from it, and the value of the company had not been determined. Husband owned approximately a 40% share of Plant Drives and Systems.

Husband's son, as conservator of Husband's property, and appoints Diana Taeubel ("Diana"), Husband's daughter, as conservator over Husband's person.

A hearing on the petition to modify was held on January 21, 2014. Husband did not testify, and it is unclear whether he was physically able to attend trial. Mark and Diana testified at trial. At trial, Mark testified about Husband's financial condition. After his stroke, Husband was moved to a skilled nursing facility in Chattanooga, which cost $7,954.00 per month. Mark testified that Husband sold his home in 2013, netting $87,000.00. Mark withdrew $44,000.00 of that sum to repay himself for approved expenses that he had advanced for Husband's estate, leaving $43,000.00 in the account. While still in Chattanooga, Husband's Medicare allowance for the skilled nursing facility ended, and Husband's family began paying $7,594.00 per month for his care. Mark testified that, although Husband had been in a skilled nursing facility in Chattanooga, they decided to move him to Pinole, California, to decrease expenses. Mark sold Husband's Dodge truck and used Husband's Honda Civic to transport his belongings to California. According to Mark, the move to California allowed the family to reduce Husband's expenses considerably. Mark stated that the total for Husband's expenses was $4,739.17 per month, excluding alimony. In light of his decreased income, Mark testified that Husband's net loss each month was $1,175.87 before he paid his monthly alimony obligation. According to Mark, Husband relied on his savings to pay Wife alimony until the court terminated his obligation. At the time of trial, Husband was residing in a board-and-care facility in California, and Mark testified that the family was paying Husband's expenses out of pocket.

Diana testified that she had been employed as an emergency room nurse for approximately twenty years and that she also assisted with Husband's care. She explained that the board-and-care facility where Husband stayed in California provided a room, meals, medication, administration, assistance with daily activities, and sitting services. To reduce Husband's costs, Diana testified that she provided skilled nursing care to Husband and transported him to different appointments. According to Diana, Husband could not dress himself, bathe himself, or administer his own medications. Further, she stated he had tremors, incontinence, difficulty communicating, and difficulty feeding himself. Diana testified to Husband's declining health and stated that he would ultimately need a 24-hour-care facility. According to Diana's research, the cost for such care is typically between $10,000.00 and $12,000.00 per month.

Wife testified that she now lives in Dawsonville, Georgia. Pursuant to the divorce decree, Husband paid her a lump sum of $91,000.00 for her portion of the equity in the marital residence. In addition to the $91,000.00 she was awarded for her half of the marital residence, Wife also received half of Husband's retirement account, equaling $125,000.00, and a percentage of Husband's pension, affording her monthly payments of $246.00. Wife

bought a home in 2004 with a mortgage on which she was paying $914.00 monthly.

Due to cancer, Wife had a liver transplant four years ago and continues making payments to the hospital for ongoing testing. According to Wife, she will require care for the rest of her life, and she has blood work done every three months and a check-up every six months. She also testified that she has been admitted to the hospital several times in the last few years. According to Wife, she suffers from health conditions related to hypertension, a heart condition known as atrial fibrillation,[5] an underactive thyroid, and diabetes. Wife asserts that she has outstanding hospital bills related to her transplant and that she takes "about 14 pills every morning and at night."

Wife also testified about her marriage to Husband and his alcohol use. According to Wife, Husband drank alcohol every day during the marriage. She testified that:

> He liked scotch. And on the weekends, every weekend, he would drink too much. When he came home from work, he would have a scotch or two. And when he wasn't working, we went on several vacations, and he stayed drunk the whole time. And the last vacation we had I told him I wasn't traveling with him ever again, because I just couldn't put up with that anymore. And so we never traveled, in the last ten years that we were married, together.

Wife testified that there was never a point in their marriage when Husband did not abuse alcohol.

No physician testified at trial, but a medical examination report completed by Dr. Robert Drake[6] and deposition testimony offered by Husband's neurologist, Dr. Matthew Kodsi, were admitted into evidence. On October 13, 2011, Dr. Drake examined Husband. He reported that Husband suffered from five disabling factors: "expressive aphasia (inability to express self with oral or written methods); seizure disorder; receptive aphasia (inability

---

[5]"Atrial fibrillation" is a cardiac arrhythmia characterized by disorganized electrical activity in the atria accompanied by irregular ventricular response that is unusually rapid. Mosby's Medical, Nursing, & Allied Health Dictionary (5th ed. 1998). During trial, Wife, explaining her atrial fibrillation, testified that "My heart beats too fast."

[6]In the conservators' Motion to Substitute Party Petitioner and to Revise Style of the Case, Dr. Drake is noted as a general practitioner. Dr. Drake's examination report was presumably made for the purpose of determining whether Husband was competent. Dr. Drake's medical examination report was authenticated by Mark at trial and was admitted into evidence as an exhibit.

to understand written or oral communication); alcohol use; possible dementia."  Dr. Drake opined that Husband was not capable of returning to work and should have a conservator appointed.

Dr. Matthew Kodsi, a board-certified neurologist, examined Husband in May 2011 and diagnosed Husband with vascular dementia, "cognitive impairment, memory problems, [and] other thinking problems."  Dr. Kodsi stated that: "Given [Husband's] impairment from the stroke, his difficulty with speech, comprehension, cognitive impairment, that would render him unable to really work."  Dr. Kodsi testified that Husband's drinking was a significant problem, but never testified that Husband's stroke and resulting inability to work were directly caused by his alcohol abuse.  Dr. Kodsi did indicate, however, that Husband's refusal to stop drinking, even after the stroke, could possibly have frustrated his recovery, as it may have caused additional seizures.   Husband also saw Dr. Kodsi again in late 2011.  Dr. Kodsi testified:

> The October [appointment] had just been a work-in appointment.  So it was just to touch base again and see how he was doing.  At that point he had another seizure in between visits and he was unfortunately still drinking, both of which are not good things. . . . I was concerned about the seizure, but that the same time it was difficult to tell if the seizure was related to his continued alcohol use.

When asked whether he believed Husband was competent at the time of Dr. Kodsi's deposition on May 11, 2012, he stated, "If you're asking my opinion, you know, just to say what do I feel right now?  I feel that he is most likely to a reasonable degree of medical certainty not competent.  But I certainly would feel more comfortable saying that if I saw him." Further, Dr. Kodsi stated that it was unlikely Husband would ever regain competency because of the absence of a response to any previous treatments, as well as indications that Husband may suffer from Alzheimer's Disease. In addition to his cognitive problems, Dr. Kodsi testified that Husband suffered from atrial fibrillation, high cholesterol, a small hole in his heart, and increased risk of irregular heart rhythms.

Following the trial on Husband's petition to terminate alimony, the trial court entered an order granting Husband's petition for termination of his alimony obligation on January 23, 2014.  In its order, the trial court stated:

> The Court finds Mr. Taeubel no longer has any ability to earn a living.  His inability to work was established by the testimony of both of his children as well as the deposition of Dr. Matthew H.

Kodsi. . . . The Court finds the stroke suffered by Mr. Taeubel in October of 2010 clearly was an unanticipated and substantial and material change in circumstances. There is no evidence in the record that any alcohol consumption or other voluntarily assumed activity of Mr. Taeubel caused the initial event which disabled him from his ability to work. . . . There is no evidence in the record that his drinking caused a stroke even if continued alcohol consumption is not recommended medically.

Accordingly, Husband's alimony obligation to Wife was terminated. Wife timely filed this appeal.

## Issues Presented

Wife presents three issues for review on appeal, which we restate:

1. Whether the trial court erred in terminating Husband's alimony obligation based on a substantial and material change in circumstance?
2. Whether the trial court erred in not finding that Husband's inability to work was foreseeable at the time the final decree of divorce was entered?
3. Whether the trial court erred by not requiring Husband to liquidate his assets to pay alimony?

## Standard of Review

Because this case was tried by the court sitting without a jury, we review the factual determinations *de novo* upon the record with a presumption of correction. Tenn. R. App. P. 13(d); ***Crabtree v. Crabtree***, 16 S.W.3d 356, 360 (Tenn. 2000). Unless the evidence preponderates against the trial court's findings, we must affirm, absent error of law. ***Id.*** In order for the evidence to preponderate against the trial court's findings, it must support another finding of fact with greater convincing effect. ***Walker v. Sidney Gilreath & Assocs.***, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000). No presumption of correctness, however, attaches to the trial court's conclusions of law, and our review is *de novo*. ***Blair v. Brownstone***, 197 S.W.3d 681, 684 (Tenn. 2006) (citing ***Bowden v. Ward***, 27 S.W.3d 913, 916 (Tenn. 2000)); ***Johnson v. Johnson***, 37 S.W.3d 892, 894 (Tenn. 2001). "Appellate courts are generally disinclined to second-guess a trial judge's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes." ***Kinard v. Kinard***, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998).

## Analysis

Wife argues that the trial court erred when it terminated Husband's alimony obligation based on her assertion that Husband did not establish that the change in his income and health was sufficient to qualify as a substantial and material change in circumstances for purposes of terminating his alimony obligation. There is no dispute that the alimony at issue is properly modifiable pursuant to the guidelines in Tennessee Code Annotated Section 36-5-121(f)(2)(A) regarding alimony *in futuro*. Tennessee Code Annotated Section 36-5-121(f)(2)(A) provides:

> An award of alimony *in futuro* shall remain in the court's control for the duration of such award, and may be increased, decreased, terminated, extended, or otherwise modified, upon a showing of **substantial and material change in circumstances**.

(Emphasis added). A change in circumstances is "material" when it occurred since the entry of the divorce decree ordering the payment of alimony and was not "anticipated or within the contemplation of the parties at the time they entered into the property settlement agreement." ***Watters v. Watters***, 22 S.W.3d 817, 821 (Tenn. Ct. App. 1999) (citing ***Jones v. Jones***, 784 S.W.2d 349, 353 (Tenn. Ct. App. 1989)). A change in circumstances is considered "substantial" when it "affect[s] either the obligor's ability to pay or the obligee's need for support." ***Bowman v. Bowman***, 836 S.W.2d 563, 568 (Tenn. Ct. App. 1991).

Wife does not dispute that Husband suffered a debilitating stroke making him unable to work and that as a result, his monthly income has significantly decreased to the point where he cannot pay his own monthly expenses without a deficit. Instead, Wife argues that the change alleged by Husband was not "material" because it was foreseeable at the time of the divorce, as Husband's deteriorating health was caused by Husband's voluntary alcohol abuse. In addition, Wife argues that the change was not "substantial" because it does not significantly affect either her need or Husband's ability to pay.

### "Material" Change in Circumstances

We begin with Wife's contention that the change at issue in this case was not "material" because it could have been anticipated by Husband at the time of the divorce. Wife's argument on this issue centers on her contention that Husband's inability to work and increased expenses were foreseeable at the time of the divorce due to Husband's voluntary decision to abuse alcohol. In her brief, Wife states:

> Based on this evidence, a reasonable conclusion is that [Husband], over many years, acted in reckless disregard for his own health, despite common sense and specific warnings, and his actions . . . led directly to his stroke and exacerbated his post-stroke condition, destroying any chance he had of recovering and returning to productivity. [Husband] did willfully engage in an activity that has known, demonstrable, certain, and significant health impacts, resulting in his disability.

Wife also contends that "[c]ommon sense and ample public information tell us that excessive drinking leads to any number of serious, disabling health problems."

The question of whether a change is unanticipated for purposes of modification or termination of alimony is generally considered in terms of foreseeability. Specifically, "[t]o be material, the change of circumstances must be shown to have been unforeseeable at the time the decree was entered." *McCarty v. McCarty*, 863 S.W.2d 716, 719 (Tenn. Ct. App. 1992) (citing *Seal v. Seal*, 802 S.W.2d 617, 621 (Tenn. App. 1990)). Courts have held that changes in tax laws, receiving social security benefits, and a spouse choosing to save his or her alimony benefits are generally foreseeable, and therefore, do not constitute a basis for modification or termination of alimony. *See Wright v. Quillen*, 83 S.W.3d 768, 774 (Tenn. Ct. App. 2002); *McCarty*, 863 S.W.2d at 719. Accordingly, in order for Wife to prevail on her claim that the change was anticipated, the change must be "sufficiently foreseeable." *Wright v. Quillen*, 83 S.W.3d at 774. Because Husband's alcohol abuse was voluntary and his resulting condition was allegedly foreseeable at the time the divorce decree was entered, Wife argues that it cannot be classified as a "material" change in circumstances. Accordingly, Wife contends that the trial court erred when it terminated Husband's alimony obligation.

In this case, the trial court specifically found that Husband's stroke and resulting inability to work was unanticipated at the time of the divorce decree, as no evidence in the record established that the stroke was caused by his alcohol consumption. Wife disagrees with this finding, and points to testimony by Dr. Kodsi that Husband's drinking contributed to his disability. Specifically, Wife points to Dr. Kodsi's testimony that Husband may have "worsen[ed] his cognitive or thinking function by staying on alcohol," even after the stroke. In addition, Dr. Kodsi testified that Husband's alleged alcohol abuse was "one of the biggest concerns" with Husband's health and that Husband continued to drink even after the stroke. Further, Wife contends that Dr. Kodsi's testimony establishes that Husband's condition would have improved, had he not been drinking.

Based upon our review of the record, we cannot conclude that the evidence

preponderates against the trial court's finding that Husband's stroke and resulting disability were unanticipated for purposes of modification of alimony. Indeed, we find no evidence in the record sufficiently establishing a causal link between Husband's inability to work and his alcohol abuse. To the contrary, Drs. Drake and Kodsi both referenced several other seemingly involuntary conditions that Husband suffered from, including atrial fibrillation and Alzheimer's Disease, and stated that these conditions may have contributed to Husband's disability. Notably, even Wife admits in her brief that "the exact date and mechanism were admittedly unknown." Without evidence tending to show causation, we cannot assume that Husband's alcohol abuse during the marriage made his stroke "sufficiently foreseeable" to prevent the stroke and inability to work from serving as a basis to modify his alimony obligation. Simply put, there is no medical testimony or other proof in the record to show that Husband's voluntary alcohol use—and not some other factor—contributed to his disability or his inability to work.

Wife argues, however, that because Husband's decision to drink alcohol was voluntary, his increased health expenses and inability to work are analogous to the situation wherein a party voluntarily takes on additional expenses. To support this contention, Wife cites **Dillow v. Dillow**, 575 S.W.2d 289, 291 (Tenn. 1978).[7] The **Dillow** case provides that "obligations voluntarily assumed are not proper to be considered as changed circumstance[s] to reduce support payments otherwise owed." In **Dillow**, the mother appealed a chancery court order that modified the support and custody provisions of a divorce decree and forgave father's child support arrearage. **Id.** at 290. The father in **Dillow** argued that his circumstances had been substantially and materially altered when he remarried, taking on obligations to provide some support for his new wife's minor children. Reversing the chancery court's termination of the father's support obligations, we held that the father was not entitled to any reduction or termination of his support obligations because his assumed

---

[7]As a point of practice, we note that there are several citations to caselaw in both briefs that omit important information—full citations to unreported cases with page numbers denoting where the relevant language or information can be found. We refer the parties to Tennessee Rule of Appellate Procedure 27(h), concerning citation of authorities. This Rule provides, in relevant part that:

> Citation of cases must be by title, to the page of the volume where the case begins, and to the pages upon which the pertinent matter appears in at least one of the reporters cited.

Tenn. R. App. P. 27(h). Had the parties adhered to this rule when providing citations to both reported and unreported case law, our review of the relevant authorities would certainly have been more manageable and the interest of judicial economy would have been better served. We take this opportunity to remind our future litigants that they should endeavor to adhere to the rules of this Court when preparing appellate briefs.

responsibilities to his new wife's children could not nullify his preexisting obligation to his own children. *See id*. at 291. We also opined that the father's testimony that he "did not intend to marry his present wife at the time of the divorce was granted is incredible in light of the proof that they both had a blood test one week before the hearing, the license was procured the day of the hearing, and they were married the next day." *Id.* Thus, the change in circumstances was not material because Husband fully anticipated the marriage, and resulting increase in expenses at the time of the divorce, and chose to undertake those expenses voluntarily.

From our reading, *Dillow* is not analogous to the present case. While in *Dillow*, the husband voluntarily chose to incur additional obligations, here there is no dispute that Husband's additional expenses were necessary due to his health. Furthermore, while the husband's remarriage in *Dillow* was fully anticipated prior to his divorce, there is no evidence in the record establishing that Husband could or should have foreseen that he would suffer a debilitating stroke that would render him unable to work. Indeed, it is unclear how this event could have been anticipated, as there was no evidence establishing a direct link between Husband's voluntary action, i.e, his alcohol abuse, and his stroke. Simply put, there is no evidence that **but for** Husband's alcohol abuse, Husband would have been able to continue to work and pay alimony at the current rate.

Wife next argues that Husband's inability to work is analogous to the situation wherein a party voluntarily decides to retire. First, we note that it does not appear that Husband's "decision" to terminate his employment was based on a voluntary retirement, but instead, on his complete inability to work due to his stroke. Regardless, we conclude that this line of cases provide no support for Wife's argument in this case.

Wife relies on *Bogan v. Bogan*, 60 S.W.3d 721 (Tenn. 2001), to support her argument. The issue in *Bogan* concerned whether a party's retirement, and resulting decrease in income, was an anticipated event for purposes of termination or modification of alimony. The Tennessee Supreme Court held that "when an obligor's retirement is objectively reasonable, it does constitute a substantial and material change in circumstances—**irrespective of whether the retirement was foreseeable or voluntary**—so as to permit modification of the support obligation." *Id.* at 729 (emphasis added). The *Bogan* court also found that the trial court should "examine the totality of the circumstances surrounding the retirement" in deciding whether it was "objectively reasonable." *Id.* Further, a retirement will not be found objectively reasonable if it is taken in bad faith for the purpose of defeating a support obligation. *Id.* at 729, 734.

The husband in *Bogan* filed a petition to terminate his support obligation alleging two substantial and material changes in circumstances: (1) that he would retire from his employer

-10-

and no longer receive a wage from the employer, and (2) that his former wife could receive half of his retirement income pursuant to the Marital Dissolution Agreement. *Id.* at 725. The **Bogan** Court ultimately found the husband's retirement to be "objectively reasonable," as it was not motivated by any attempt to avoid payment of a support obligation and because the husband had been eligible to retire with full benefits for some time prior, which indicated that he did not retire as soon as he was able so he could diminish his income. *Id.* at 731. Moreover, the husband's employer's attempt to downsize led to more of its workers, including the husband, to be "forced" into retirement, which the court also found indicated that his retirement was reasonable. *Id.* In **Richards v. Richards**, No. M2003-02449-COA-R3-CV, 2005 WL 396373 (Tenn. Ct. App. Feb. 17, 2005), we relied upon **Bogan** to determine that a husband's retirement was "objectively reasonable" when the husband was in his early seventies and faced health problems relating to his knees and eyesight. *Id.* at *8. Again, we note that in both **Bogan** and the **Richards** cases the retirees both made a voluntary decision to cease their employment.

The facts and holding of **Bogan** support a conclusion that even if we were to characterize Husband's loss of income in this case as a retirement, the retirement was "objectively reasonable." Indeed, it appears from the record that Husband's poor health left him no choice but to cease his employment. Thus, his decision to cease his employment is "objectively reasonable." **Bogan**, 60 S.W.3d at 729. Further, we cannot conclude that either Husband's retirement or the condition that led to his retirement was based on purposeful action to defeat Wife's alimony. *Id.* As previously discussed, there is simply no evidence in the record that Husband's alleged alcoholism was the direct cause of his disability, much less that Husband's alleged continued use of alcohol was engineered to frustrate Wife's ability to collect her alimony payments.

Based on the foregoing, we conclude that Husband's stroke and resulting inability to work were a "material" change in circumstances for purposes of modifying or terminating alimony. As previously discussed, there is no evidence that Husband's disability was caused by any voluntary action on his part. Further, there is no evidence that Husband's increased expenses and decreased income were the product of bad faith. As stated in its order, the trial court hearing this evidence declined to find that Husband's inability to work was foreseeable based upon this record. After thoroughly reviewing the evidence, we decline to hold that the trial court abused its discretion in determining Husband established a material change in circumstances. *See id.* at 729 (citing **Crabtree v. Crabtree**, 16 S.W.3d 356, 360 (Tenn. 2000)).

### "Substantial" Change in Circumstances

Next, we consider Wife's contention that Husband's changed circumstances were

nevertheless insufficient to support a modification or termination of his alimony obligation. As previously discussed, only a substantial and material change in circumstances is sufficient to justify a change in alimony. *See* Tenn. Code Ann. § 36-5-121(f)(2)(A). A change in circumstances will only be considered "substantial" when it "affect[s] the obligor spouse's ability to pay or the obligee spouse's need for the alimony awarded." ***Bowman v. Bowman***, 836 S.W.2d 563, 568 (Tenn. Ct. App. 1991) (citing ***Threadgill v. Threadgill***, 740 S.W.2d 419, 422–423 (Tenn. Ct. App. 1987). Thus, even a material change of circumstances does not necessarily require a reduction of alimony, if the payor still has the ability to pay the support awarded and the need of the payee has not diminished. ***Id.***

Wife argues that the trial court erred by not requiring Husband to liquidate some of his assets to continue paying alimony. To support this argument, Wife cites this Court's Opinion in ***Bowman v. Bowman***, 836 S.W.2d 563 (Tenn. Ct. App. 1991). In ***Bowman***, the husband filed a petition to terminate his alimony payments, on the basis that he had surgery to remove a cancerous kidney and could no longer work. ***Id.*** at 568–69. The Court concluded that the husband's poor health and inability to work qualified as a change in circumstances, but concluded that the change was not substantial because it did not adversely effect the husband's ability to pay alimony and the wife's need had not diminished. ***Id.*** at 569. Instead, the trial court found that the husband had assets that could be liquidated to pay the support. Moreover, the trial court found that the parties' son was "wasting" the marital estate. The Court, however, cognizant of the fact that the liquidation of assets would leave the husband with no assets upon which to support himself, limited the alimony obligation to one year from the date of the appellate Opinion. ***Id.***

Wife argues that the ***Bowman*** decision stands for the proposition that alimony may not be terminated when the obligor has sufficient assets that could be liquidated to pay the alimony obligation. Accordingly, Wife argues that the trial court erred in failing to require Husband to liquidate his assets in order to continue paying alimony. The trial court, however, specifically considered and rejected this argument. As to Wife's income and assets, the trial court's order provides:

> [Wife] has a gross monthly income of $3,176.07 per month. [Wife] invested part of the lump sum proceeds from the division of assets and liabilities into a house which she now owns subject to debt. She has $109,000.00 left in her IRA and $23,000.00 equity in the house. . . . [Wife] does have expenses for mortgage and utilities. It must be noted that her mortgage payment increases the equity she holds in the residence. Her monthly expenses include some discretionary spending in excess of that of [Husband].

-12-

Regarding Husband's income and assets, the trial court's order provides:

> [Husband] has assets totaling $343,625.72, of which $100,000.00 is not liquid. The testimony of the parties and the income expense statements of the parties reflect [Husband] has a net monthly income deficit of $1,175.87 without including the alimony. . . . His ability to pay rests only in the assets that are the result of the division of assets and liabilities in the divorce and which monies will be necessary to support him in the future.

Thus it appears that the trial court questioned some of Wife's expenses and ultimately found that Husband's assets would be required for his own support.

In reviewing a trial court's decision, appellate courts typically defer to a trial court's findings on spousal support. *See* **Gonsewski v. Gonsewski**, 350 S.W.99 (Tenn. 2011). Tennessee courts,

> [f]or well over a century, . . . have recognized that trial courts should be accorded wide discretion in determining matters of spousal support. This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award.

*Id.* at 105 (citations omitted). Additionally, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Id.* (citing **Broadbent v. Broadbent**, 211 S.W.3d 216, 220 (Tenn. 2006).

From our review of the record, we cannot conclude that the trial court abused its discretion in finding that Husband's changed circumstances were "substantial" and that his alimony obligation should be terminated. In the instant case, the situation differs materially from the situation in **Bowman**. First, although there is no dispute in this case that Wife is unable to work and has significant health issues of her own, the wife in **Bowman** was in a worse situation, as she was confined to a wheelchair and required full-time help to meet her needs. **Bowman**, 836 S.W.2d at 567. Furthermore, while Wife in this case has independent income, there is no indication in **Bowman** that the wife had any source of income other than the income derived from alimony. In addition, the alimony modification proceeding in **Bowman** occurred around the same time as the party's divorce. Thus, neither party had yet

received any of their equitable portion of the marital estate. The ***Bowman*** Opinion makes clear that the alimony awarded was temporary in nature, until the wife could receive her share of the marital property. Here, in contrast, Wife received her share of the marital property over a decade ago and it appears that at least a portion of the assets sought to be liquidated were awarded to Husband as part of the division of marital property. *See **Richards v. Richards***, 2005 WL 396373 (Tenn. Ct. App. Feb. 17, 2005) (holding that assets awarded to a spouse during the division of marital property are not relevant to a determination of whether a substantial and change in circumstances exists to justify a modification or termination of a support award); *c.f.* ***Wright v. Quillen***, 83 S.W.3d 768, 774 (Tenn. Ct. App. 2002) (noting that spouse's choice to save rather than spend is not an appropriate consideration with regard to modification of alimony). Finally, we note that the trial court in ***Bowman*** specifically found that the parties' son was "wasting" the marital assets. There is no such finding in this case that Husband's expenses are inflated or unnecessary.[8] While Wife takes issue with some of Husband's charges for eating out, the trial court specifically found that Wife's discretionary expenses in this case were somewhat more inflated than Husband's. Thus, the situation in this case is not analogous to the situation in ***Bowman*** or any similar cases cited by Wife in her brief. *See also **Siefker v. Siefker***, No. M2002-01081-COA-R3-CV, 2003 WL 21525263 (Tenn. Ct. App. July 8, 2003) (refusing to terminate alimony based on: 1) the husband's separate assets that could be liquidated; and 2) husband's future income of $50,000.00 per year).

In light of the trial court's thorough comparison and analysis regarding the parties' incomes and assets, we conclude that the trial court did not abuse its discretion when it did not require the liquidation of Husband's assets to pay alimony. Further, we hold that the trial court did not err when it found that Husband met his burden in establishing a substantial and material change in circumstances. Thus, the judgment of the trial court terminating Husband's alimony *in futuro* obligation to Wife is affirmed.

**Conclusion**

Based on the foregoing, we hold that Husband's petition to terminate alimony was properly granted by the trial court. The judgment of the Circuit Court of Hamilton County is, therefore, affirmed, and this cause is remanded to the trial court for all further proceedings as may be necessary and are consistent with this Opinion. Costs are taxed to Appellant, Lucy Adelaine Dennington Taeubel, and her surety.

---

[8]In fact, the trial court's order in this case states that the "conservators have done an admirable job of conserving assets by moving [Husband] from the health center [in Chattanooga] . . . to the facility in California where his daughter is able to provide the physical therapy and skilled nursing care."

-14-

_____
J. STEVEN STAFFORD, JUDGE