IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 17, 2015 Session

## RICHARD JERONIMUS v. ZOILA MARIA JERONIMUS

**Appeal from the Circuit Court for Williamson County**
**No. 2012290      Robbie T. Beal, Judge**

_____

**No. M2014-02207-COA-R3-CV – Filed April 15, 2016**
_____

Divorce proceeding in which Husband contends that the trial court erred in dividing the marital assets and debts, in setting parenting time, and determining that Wife is the economically disadvantaged spouse.  Wife contends that the court erred in not ordering Husband to formulate and sign the letter of instruction transferring assets from his IRA account; in not awarding a higher amount in transitional alimony; in failing to designate a party to be responsible for processing the qualified domestic relation orders for two retirement accounts; and in granting the divorce based on Husband's Amended Complaint for divorce.  Wife asks this court to impose restrictions on Husband's ability to initiate future litigation.  Finding no error, we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Mark Freeman, Nashville, Tennessee, for the appellant, Richard Jeronimus.

Zoila Jeronimus, Franklin, Tennessee, Pro Se.

### OPINION

### I.      BACKGROUND

Richard Jeronimus ("Husband") and Zoila Maria Jeronimus ("Wife") were married on December 23, 1986; four children were born of the marriage, two of which were minors at

the time the complaint for divorce was filed. On May 31, 2012, Husband filed a complaint for divorce on the grounds of irreconcilable differences and inappropriate marital conduct; Wife answered and counterclaimed for divorce on the same grounds. In her counter-complaint Wife sought *pendente lite* support, and on May 14, 2013, the court entered an agreed order providing that Husband would pay Wife $600 per month. In due course Husband amended his complaint to add the ground of adultery, and Wife amended her counter-complaint to add a request for alimony.

Following a trial on April 21 and 28, 2014, the court entered an order awarding Husband a divorce on the ground of inappropriate marital conduct; dividing the marital assets and debts; awarding Wife transitional alimony of $1,000 per month for four years to be followed by an additional year of alimony *in solido* of $1,000 per month;[1] and adopting a parenting plan in which the minor child spent 198 days with Wife and 167 days with Husband.[2]

Both parties have raised numerous issues on appeal; for ease of analysis, we will address the issues in the following categories: (1) the parenting plan; (2) the award of alimony; (3) the division of marital assets and debt; and (4) additional matters.

## II.  DISCUSSION

### A.  The Parenting Plan

The first issue we address is Husband's argument that the court erred in the allocation of parenting time for the minor child. In her brief on appeal, Mother states that the child graduated from high school in May 2015 and has reached the age of majority. Husband did not respond or take issue with this statement in his reply brief or at oral argument. Moreover, Father's complaint for absolute divorce lists two minor children, with their dates of birth as May 15, 1995 and March 31, 1997. We accept Wife's representation as well as the statement in the complaint. Inasmuch as the child in question has reached the age of majority and has graduated from high school, the child is not subject to a parenting plan; consequently, this issue is moot.

---

[1] The court stated that this was "to reimburse a portion of Wife's attorney's fees."

[2] The other child who was a minor at the time the complaint was filed had reached the age of majority by the time the final decree was entered.

2

**B. Award of Alimony**

Husband contends that the court erred when it held Wife to be economically disadvantaged; that the court failed to properly calculate the parties' income; and that the final decree contained "several inconsistent findings of fact and conclusions of law as it relates [to] determining the parties' income, the Wife as economically disadvantaged spouse, and the basis for the award of transitional alimony and alimony *in solido*." Wife contends that the court correctly granted transitional alimony but argues that the amount awarded was inadequate.

The trial court is given broad discretion to determine whether spousal support is needed and, if so, its nature, amount, and duration. *Broadbent v. Broadbent,* 211 S.W.3d 216, 220, (Tenn. 2006); *Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004) A court may award rehabilitative alimony, alimony *in futuro*, transitional alimony, alimony *in solido,* or a combination of these. Tenn. Code Ann. § 36-5-121(d)(1). There are no hard and fast rules for support decisions. *Manis v. Manis*, 49 S.W.3d 295, 304 (Tenn. Ct. App. 2001) (citing *Kinard v. Kinard*, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998)). Such decisions require a careful balancing of the relevant factors, and the determinations hinge on the unique facts of each case. *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). Accordingly, appellate courts are generally disinclined to second-guess a trial court's spousal support decision unless it is not supported by the evidence or is contrary to public policy as reflected in applicable statutes. *Bogan*, 60 S.W.3d at 727 (citing *Kinard*, 956 S.W.2d at 234); *Nelson v. Nelson*, 106 S.W.3d 20, 23 (Tenn. Ct. App. 2002). Our role is to determine whether the award reflects a proper application of the relevant legal principles and is not clearly unreasonable. *Bogan*, 60 S.W.3d at 733. "When the trial court has set forth its factual findings in the record, we will presume the correctness of those findings so long as the evidence does not preponderate against them." *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000); see also Tenn. R. App. P. 13(d); *Bogan*, 60 S.W.3d at 727;

Tennessee Code Annotated § 36-5-121(i) directs the court to consider relevant factors when it determines "whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment." It is well settled that the two most important factors to be considered are the disadvantaged spouse's need and the obligor spouse's ability to pay. *Bratton*, 136 S.W.3d at 604; *Robertso*n, 76 S.W.3d at 342.

The statutory factors which were considered by the court in this case included: the relative earning capacity, Tenn. Code Ann. § 36-5-121(i)(1); the relative education and training of each party, § 36-5-121(i)(2); the duration of the marriage, § 36-5-121(i)(3); the

age and mental condition of each party, § 36-5-121(i)(4); employment outside the home, § 36-5-121(i)(6); the parties' separate assets, § 36-5-121(i)(7); the standard of living the parties enjoyed during the marriage, § 36-5-121(i)(9); and the contributions each party made to the other's ability to earn, § 36-5-121(i)(10).[3] We begin our analysis with a discussion of each party's earning capacity.

### 1.  *Husband's Earning Capacity*

With respect to Husband's earning capacity, the court stated the following:

> The court believes that the Husband has the ability to earn approximately $100,000.00 a year.  Husband stated that his income has taken a significant cut and a bonus is no longer available to him.  The court realizes that $100,000.00 is more than what Husband proffered as his income.  The court believes that because the Husband has the experience that he does that his income is subject to increase a little bit and the court finds that he has the ability to earn $100,000.00 a year.

The evidence of Husband's income consisted of his testimony and several documentary exhibits.  Husband testified that in 2009 he worked for four companies as a total commission employee and that year was the only year he did not earn at least $80,000; that he was employed with Ricoh, Inc. for over three years until February 2013; and that Recondo Technology was his current employer.  He also testified that his annual income at Recondo was $94,388, composed of a base salary of $82,388 per year and approximately $1,000 per month in commissions.

The documentary evidence consisted of:

(1)     An Amended Statement of Issues, Income, Expenses, Property, Assets and Debts, which the clerk's stamp indicates was filed on November 12, 2013;[4]

---

[3] The court listed fault as a factor, but stated: "The court did not consider fault when awarding alimony."

[4] An order entered on November 19, 2013, recites that a hearing was set for November 12, 2013 on Wife's Motion to Distribute Funds for Wife's Mediation and Attorneys Fees Due and that, prior to the hearing, the parties resolved the motion.  The record contains three exhibits which were marked by the court as admitted on that date: Wife's Statement of Income and Expenses, Husband's Amended Statement of Issues, Income, Expenses, Property, Assets and Debts, and Wife's Payroll Account and Direct Deposit.  There is no transcript of any hearing on that date or order reflecting the results.  In the absence of any explanation of or citation to

(2)     Husband's Statement of Issues, Income, Expenses, Property, Assets and Debts (hereinafter "Husband's Statements of Income"), introduced as Exhibit 1 at the April 21, 2014 trial, in which Husband lists his gross wages as $7,865.73 per month;

(3)     Trial Exhibit 2, which Husband testified was the calculation of his annual income of $94,388.76;

(4)     Trial Exhibit 5, a pay stub from Recondo Technology for the period 4/1/14 – 4/15/14 showing net pay for that period of $3,374.98 and year to date commissions of $4,223.19;

(5)     Two W-2 statements for 2013, the first from Ricoh USA, reporting W-2 wages of $15,087.42 and the other from Recondo Technology, reporting wages, tips and other compensation of $88,645.33.

The testimony and exhibits show that Husband routinely earned at least $80,000, with the exception of 2009; that in 2013 he earned $103,732; and that in his current employment he has an annual salary of $94,000, a portion of which is from commissions. Husband provided very little explanation relative to the nature, calculation, frequency, or reliability of the commission portion of his income at trial and argues on appeal that the $100,000 figure "was more than the evidence established." We disagree.

In Exhibit 2, Husband calculated his annual base pay at $82,388, using a monthly salary of $6,865 and his commission income at $1,000 per month. Exhibit 5 shows that the amount of commissions for the period January 1 through April 15, 2014 was over $1,000, if prorated monthly. In the absence of other evidence, to which we have not been cited, the testimony and documentary evidence of Husband's earnings history supports the trial court's finding that Husband has an earning capacity of $100,000.00.

### 2. *Wife's Earning Capacity*

Husband argues that the determination that Wife has an earning capacity of $50,000 is against the weight of the evidence. With respect to Wife's earning capacity, the court stated the following:

The Wife's income was a little more difficult to calculate. The Wife has earned more in the past than she is currently. The Wife claimed upwards of $70,000.00. She has also claimed that certain conditions have required her to

testimony relative to these exhibits, we have not included the financial information contained therein in our analysis.

cut back significantly. No. 1 being her health, Wife has claimed some health conditions. The court is not in a position to dispute those claims, however, the court cannot say that she is unable to work a fairly significant amount and that also her working as much as she has in years past was out of necessity due to the parties' separation and in effect it is discouraged by her employer and it may not be available or something that she feels she is able, physically or emotionally, to keep up that type of pace. The Court accepts her testimony. The court is not required to set an income amount at the absolute maximum that the parties are able to earn. The court has to consider that the parties need to maintain some standard of living outside of work. Therefore, considering the Wife's age and experience, the court finds that Wife has the ability to earn $50,000.00 a year.

The evidence of Wife's income consisted of testimony of Wife and her sister, Elissa Walker, and several documentary exhibits. Wife testified that she is employed as a flight attendant for Delta Airlines and previously worked in that capacity for Northwest Airlines; that her income is $45,000 a year in base pay; and that she primarily flies three international flights of 25-28 hours each, totaling approximately 75 hours per month.[5]

The documentary evidence of Wife's income in the record includes:

(1)     Wife's Statements of Income and Expenses, filed November 12, 2013;[6]
(2)     Exhibit 17, Wife's Statements of Income and Expenses, filed April 21, 2014, which lists $1,248.36 per month in gross income per pay period;
(3)     Exhibit 18, consisting of her 2013 W-2 statement, which lists wages, tips, and other compensation as $70,360.01 and payroll account statements from Delta Airlines for the period 10/15/2013 to 3/14/2014, listing a range of bi-weekly gross earnings from $877.18 to $2,490.07;
(4)     Exhibit 31, a payroll account statement from Delta for the period 12/16/2012 – 12/31/2012 with gross earnings of $4,197.78;

---

[5] Wife's testimony as to the interplay between the hours she worked and the annual base salary was not clear. Wife did not testify as to her specific hourly or overtime rates. With respect to the availability and scheduling of hours, she testified that flight attendants book work schedules through a bidding process based on seniority and that international flights are high priority trips; that the company only allows flight attendants to bid 45-75 hours a month and that anything over 75 hours a month is considered overtime; and that flight attendants who want to work more than 75 hours a month must wait until every flight attendant in the system has scheduled 75 hours and then attempt to "pick up" hours on their own through an online system. Ms. Walker testified that her hourly rate was $36.00 per hour and that Wife's rate was "pretty close" to hers.

[6] See *supra* note 4.

6

(5)     Exhibit 32, a payroll account statement from Delta for the period of 10/1/2013 – 10/15/2013, listing gross earnings of $2,390.07 and year to date earnings of $65,653.76;

(6)     Exhibit 33, a payroll account statement from Delta for the period of 12/16/2013 – 12/31/2013, listing gross earnings of $2,215.43 and year to date earnings of $77,560.33;

(7)     Exhibit 42, consisting of check stubs for Northwest Airlines dated 12/27/2006, listing $43,640.13 year to date earnings, 12/27/2007 listing $48,368.84 year to date earnings, 12/26/2008 listing $53,032.32 year to date earnings, and 12/24/2009 listing $56,078.32 year to date earnings and check stubs for Delta Airlines dated 12/27/2010 listing $58,658.39 year to date earnings, 12/27/2011 listing $70,797.75 year to date earnings, 12/31/2012 listing $82,774.56 year to date earnings, 8/30/2013 listing $58,233.11 year to date earnings, and 10/15/2013 listing $65,653.76 year to date earnings; and

(8)     Exhibit 43, Wife's crew activity reports from 2009-2014 listing her monthly flying hours.

Much of Wife's testimony was devoted to explaining the variations in her income over the years, as reflected in the documentary evidence.  With respect to her 2012 earnings of $82,774.57 and previous earnings, she testified that she flew more hours during the marriage to pay bills; that her pay was reduced as a result of Northwest Airlines bankruptcy; and that after she moved out of the marital home, she flew practically every day of the month to support herself and her children because Husband did not honor an agreement to provide her with $1,500 a month in financial assistance.  With respect to the activity sheets in Exhibit 43, Wife testified about the hours she flew and the number of monthly trips she took between August 2013 and April 2014; specifically, she stated that in August 2013 she took three trips which totaled approximately 84 hours; in September she took three trips which totaled approximately 83 flying hours; in November she took three trips which totaled approximately 82 hours; in December she took one trip which totaled approximately 27 hours; in January 2014 she took one trip which totaled approximately 27 hours; in February she took two trips which totaled approximately 58 hours; in March she took three trips which totaled 73 hours; and in April she took three trips which totaled 82 hours. [7]

---

[7] Wife testified that there was some disparity in the hours reported on the crew activity sheets and the number of her trips in the months of December 2013, and January and March 2014, due to the fact that a number of the hours reported were due to her taking vacation time or to using "credits" that she had accrued; she did not explain what the "credits" were.

Wife also testified that she suffers from medical conditions that have caused her to decrease her flying hours; specifically, that she suffered a pancreatic attack in June of 2013, had her gallbladder removed the following December; that she suffers from daily morning nausea and frequent bathroom use as a result of her pancreatic attack; and that she is not comfortable flying more than 75 hours (three trips per month) as a result of her physical condition.

Ms. Walker testified that 70-75 hours was a "reasonable" amount for a person to fly; that she was concerned about Wife during the two years since the divorce was filed because Wife was flying an excessive amount of hours; that flying 150-200 hours a month is "dangerous" and "insane"; and that she was concerned that flying increased hours took a toll on Wife's physical health.

Husband has not cited to evidence which preponderates against the court's finding, but argues that the evidence does not support the finding. The trial court, however, accepted Wife's testimony as to the limitations caused by her medical conditions and her explanation for why she flew more hours in prior years. The finding that Wife's earning capacity is $50,000.00 per year is supported by the evidence. This amount is above Wife's base salary and acknowledges that, within any limitations imposed by her physical condition, she may achieve additional pay.

Accordingly, we affirm the trial court's holding that Wife is economically disadvantaged and proceed to address her argument that the amount of transitional alimony awarded is inadequate.

### 3. *Amount of Alimony Awarded*

The trial court did not make specific factual findings relative to the amount of alimony awarded; the court stated:

> The Court finds that the alimony requested is in the form of transitional alimony and the court believes that transitional alimony is appropriate alimony award here. . . . Wife merely needs assistance to adjust to the economic consequences of the divorce based upon the other factors. $1,000.00 a month for a period of four (4) years is not an unreasonable request and will be granted in total.

Wife contends that the award of transitional alimony was appropriate, but that the amount awarded should have been determined according to the following formula: using the earning capacity figures of $100,000 for Husband and $50,000 for Wife, the court should

8

have added them together and divided the total in half, deducted her income of $50,000 from her half, and awarded her the balance of $25,000 per year; alternatively, she suggests that the same formula be applied using the income figure of $70,000 that Husband argued she could make, to award her $15,000 per year.

As we consider this issue, we are guided by the statement of purpose for transitional alimony set forth in *Gonsewski v. Gonsewski*:

> [T]ransitional alimony is appropriate when a court finds that rehabilitation is not required but that the economically disadvantaged spouse needs financial assistance in adjusting to the economic consequences of the divorce. Tenn.Code Ann. § 36–5–121(d)(4), (g)(1); *Riggs [v. Riggs],* 250 S.W.3d [453] at 456 n. 5 [(Tenn. Ct. App. 2007)]. Simply put, this type of alimony "aid[s] the person in the transition to the status of a single person." *Mills v. Mills,* No. M2009-02474-COA-R3-CV, 2010 WL 3059170, at *5 (Tenn. Ct. App. Aug. 4, 2010);

350 S.W.3d 99, 109 (Tenn. 2011). We are also guided by the standard to determine whether the court abused its discretion, set forth in *Eldridge v. Eldridge*:

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to propriety of the decision made." A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

42 S.W.3d 82, 85 (Tenn. 2001) (internal quotations omitted).

The nature, amount, and duration of the award are supported by the following portion of Wife's testimony:

> Q. And do you have a specific dollar amount in mind that you want the Court to award you?

> A. Well, I was hoping for at least a thousand dollars a month that - - like he's doing now and - - for a few years till I can get on my feet, get some bills paid off.

9

Q. How many years?

A. Four years.

In addition to Wife's testimony, the amount is supported by the parties' income and expense statements; noteworthy is the fact that both Husband and Wife include expenses relating to their children, all of whom have reached the age of majority. As noted by Wife in her testimony and as reflected on her expense statement, she has significant debt which needs to be paid.

While there is no precise formula for the calculation of an award of alimony, Wife's proposal is arbitrary and not based on an appropriate use of the figures upon which her proposal is based. Earning capacity figures are used to determine the threshold issues of ability to pay and need; the nature and amount of the award is a separate determination, based on different evidence and used for a different purpose. The evidence fully supports the determination that an award of transitional alimony for four years at $1,000 per month and an award of alimony *in solido* of $12,000, after the expiration of that period, also to be paid monthly, is appropriate; the court did not abuse its discretion in making the award.

## C. Division of Marital Assets and Debts

The division of the parties' marital estate begins with the classification of the property as separate or marital property. *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001). Once property has been classified as marital property, the court should place a reasonable value on property that is subject to division. *Edmisten v. Edmisten*, No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at *11 (Tenn. Ct. App. May 13, 2003). The parties have the burden to provide competent valuation evidence. *Kinard*, 986 S.W.2d at 231. Once the marital property has been valued, the trial court is to divide the marital property in an equitable manner. Tenn. Code Ann. § 36-4-121(a)(1); *Miller*, 81 S.W.3d at 775. A division of marital property in an equitable manner does not require that the property be divided equally. *Robertson*, 76 S.W.3d at 341. Dividing a marital estate is not a mechanical process but rather is guided by considering the factors in Tenn. Code Ann. § 36-4-121(c). *Kinard*, 986 S.W.2d at 230.

The trial court identified the marital assets and divided them as follows:

(1)     $80,000 on deposit with the court clerk, as proceeds of sale of real estate, divided equally;
(2)     Fidelity 401k with a balance of $56,000 and encumbered by a loan of $10,000 to Wife;

(3)    Schwab 401k account in the amount of $98,000 awarded to Husband;
(4)    T-Rowe Price account in the amount of $30,000 awarded to Wife;
(5)    Skyline account valued at $15,000 to Wife;
(6)    Ricoh 401k valued at $29,000 to Wife;
(7)    Ricondo 401k valued at $7,000 to Husband;
(8)    Ricondo IRA valued at $3,500 to Wife;
(9)    Northwest Airlines pension plan, divided equally;
(10)   2006 F-150, valued at $9,000 to Wife;
(11)   2007 Ford Expedition valued at $7,500 to Husband;
(12)   2008 Hummer valued at $7,500 to Wife;[8]
(13)   Northwest Airlines Pension Plan, which the court divided equally; the court assigned no value to this asset.

The court also included six personal bank accounts of nominal value in the name of either party, which it awarded to the party in whose name the account was titled; a Stern Agee account in Husband's name which was not considered because it had a minimal balance; Ricondo stock options in Husband's name which had no value; a Vanguard Education IRA maintained for the benefit of the parties' children with a value of $6,000, which was not divided; furniture and personal belongings which were awarded to the party in possession, as to which the court did not place a value; gold coins which were a gift from Husband's father to Husband, as to which the court did not place a value; and "Delta Airlines Rewards," to which no value was assigned and which were awarded to Wife. Neither party objects to the classification of any item as marital property or the value assigned to the item by the court.

The trial court identified and divided the marital debt as follows:

(1)    GM MasterCard, with a balance of $7,000 to Husband;
(2)    Pier One Credit Card, with a balance of $1,000 to Husband;
(3)    American Signature Credit Card, with a balance of $1,500 to Husband;
(4)    Sam's Credit Card, with a balance of $1,000 to Husband;
(5)    Tutor doctor bill for the child, with a balance of $500 to Husband.

The court also identified $60,500 in various loans and accounts as Wife's separate debt, and a Chase Credit Card and HH Gregg Credit Card, with no amount specified, as Husband's

---

[8] In Husband's Statement of Assets (Trial Exhibit 1) he stated that the value of this vehicle was $11,423; in the Final Decree, the court set the value at $7,500, noting that "the court accepts the testimony of Wife that the value of the Hummer is significantly less based on the damage to the vehicle."

separate debt.[9]  Neither party raises a concern as to the classification of the debt or the amount.

Husband contends that the court erred in allocating $133,500 of $238,500 in financial accounts held as marital assets to Wife, rather than dividing the accounts equally, and in assigning him the marital debt of $11,000.  In this regard, Husband identifies only the assets in the financial accounts which were divided by the court; he does not include the $80,000 on deposit with the clerk or the valuation of three vehicles, totaling $24,000, in his calculation. In addition, Husband's total should be reduced by $10,000, inasmuch as the court reduced its valuation of the Fidelity 401k to $46,000, in light of Wife's loan against the account.  The assets figure we use in reviewing the division of the marital estate, therefore, is $332,500; the value of the assets awarded to Wife totaled $180,000 and the value of assets awarded Husband totaled $152,500.

## 1. *Assets*

Husband argues that the division of assets was based on the court's determination that Wife is the economically disadvantaged spouse, a determination he asserts has "no basis in fact or law."  We have previously determined that the record does not preponderate against this holding, which is a pertinent factor as we consider the division of marital property. *See, e.g.*, Tenn. Code Ann. § 36-4-121(c)(8).  Consequently, we proceed to address Husband's argument that the funds in the financial accounts should have been divided equally and that he should have been awarded Wife's Delta Airlines pass privileges.

As noted by the trial court, the majority of marital assets were in accounts to which access was restricted (e.g., 401ks, IRAs, and investment accounts), which would cause "a bit of an issue with liquidity"; it is true the parties will not be able to access the funds in the accounts for several years.[10]  With respect to the more readily accessible cash assets, the court divided the $80,000.00 on deposit with the clerk equally and awarded Husband and Wife the bank accounts in each party's name; the household furnishings and personal belongings were awarded to the party in possession of the same.  While the division of the assets held in restricted accounts was not equal, the division of the remainder of the other cash assets and personal property was substantially equal.

---

[9] In Trial Exhibit 1, Husband listed the balance on the Chase account as $4,619.83 and the balance on the HH Gregg account as $0.00.

[10] Wife and Husband were both 51 years old at the time the divorce action was initiated.

12

Neither party cites to the record in discussing the court's action relative to the Delta Airlines pass privileges, which the court awarded to Wife; we have found the following testimony of Wife in this regard:

Q. Okay. Now, the airline pass privileges, are those something that he has ever expressed an interest in with you before?

A. No, ma'am. He told me on many occasions that he would never use those passes because he hated them, because he -- they were standby and he always got stuck somewhere, but he refused to use them. He would drive to Florida before he would use those passes.

Q. Okay. Do you even have the ability to give him a pass?

A. Well, we have the Buddy Passes that my sister mentioned and there are eight a year, and my son is now uneligible [sic] for pass-riding because he's over 23, so I have him as my buddy.

Q. Okay. And do you -- can -- do you have others who use the Buddy Passes?

A. Family members, brothers, sisters. Mainly family members. And those are passes that they do not belong to me. They belong to the company. I do not own those. Those are employee privilege and those could be taken away at any time if anyone ever -- that I give a Buddy Pass to – is misbehaving on a flight or does something to get me in trouble by accident or just bad judgment on a flight. I could lose those passes. So I am very careful on who I give those to.

Wife's unrebutted testimony that Husband disclaimed an interest in the passes is ample support for the court's award of the passes to Wife, particularly inasmuch as there was no monetary value assigned to them.

The division of the marital assets reflects a practical and appropriate application of the factors at Tenn. Code Ann. § 36-4-121(c)(1), (2), (4), (8) and (11) to the facts presented.[11]

---

[11] Tenn. Code Ann. § 36-4-121(c) states, in pertinent part:

(c) In making equitable division of marital property, the court shall consider all relevant factors including:
(1) The duration of the marriage;
(2) The age, physical and mental health, vocational skills, employability, earning capacity,

## 2. *Debts*

Husband does not dispute the court's classification of the debt listed earlier as marital debt; he argues that the court erred in making him solely responsible for it.

"'[M]arital debts' are all debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing." *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). Our Supreme Court has instructed that four factors should be considered in dividing marital debt: (1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt. *Id.* (citing *Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989)). Further, as noted in *Mondelli,* "Courts should apportion marital debts equitably in much the same way that they divide marital assets. When practicable, the debts should follow the assets they purchased." 780 S.W.2d at 773 (internal citations omitted).

With respect to the Pier One and American Signature credit card balances, the court found that each debt:

> [W]as incurred after separation by the Wife without consent of the Husband. This debt was incurred to provide the basic furniture needs that were required. The Husband took the lion's share of the furnishings, and this award does a lot to even that out even though it is not equitable.

While Husband argues that the factual finding that he received the majority of the furnishings "is simply not supported by the record," he does not cite to any evidence which preponderates against this finding and, upon our review, we fail to discover such evidence.

With respect to the GM MasterCard account, the court noted that the account was closed when the parties separated and that Husband had used $10,000 in marital funds to pay the account down to the $7,000 balance at the time of the hearing; again Husband does not cite to any evidence preponderating against these findings and we fail to discover any.

---

estate, financial liabilities and financial needs of each of the parties;

* * *

(4) The relative ability of each party for future acquisitions of capital assets and income;

* * *

(8) The economic circumstances of each party at the time the division of property is to become effective;

* * *

(11) Such other factors as are necessary to consider the equities between the parties.

The court found that the bulk of the Sam's Credit Card debt accrued during the marriage and that the Tutor Doctor debt was incurred for the benefit of the child. As to these debts, Husband again fails to cite evidence contrary to or preponderating against the court's finding, but merely argues that the debt "should have been split equally between the parties."

The findings relative to each debt are not contested by Husband and we do not find the allocation of each debt to Husband, totaling $11,000, to be inequitable in light of the entire evidence. Wife has separate debt totaling $60,500[12] and, by virtue of his greater salary, Husband has the greater ability to pay the marital debt. The division of debt is supported by the evidence, is not inconsistent with the factors at Tenn. Code Ann. § 36-4-121(c), and reflects a proper consideration of the *Alford* factors.

For the foregoing reasons we hold that the division of assets and debts was equitable and affirm the same.

### D. Additional Matters

Wife asserts that the court "erred in not assigning a responsible party to process the QDRO's [Qualified Domestic Relations Orders] on [Husband's] two 401(k) accounts"; "in not requiring [Husband] to sign a letter of instruction to transfer [Husband's] IRA account"; and in awarding Husband the divorce based on his Amended Complaint as opposed to his initial complaint. Wife also asks this court to hold that Husband is a vexatious litigant and impose restrictions on his ability to initiate litigation in the future.

#### 1. *The QDRO and IRA Accounts*

With respect to the QDROs relative to Husband's 401(k) accounts and the letter of instruction for his IRA account, Wife states in her brief that Husband has filed a motion for a stay on these accounts and that the stay should be lifted. She does not state the reasons for the stay and Husband does not address this matter in his reply brief. Inasmuch as these matters are apparently pending in some fashion before the trial court and are related to enforcement of the final decree, they are more properly addressed to that tribunal.

#### 2. *The Amended Complaint*

Wife argues that the evidence does not support the decision to grant the divorce based on Husband's Amended Complaint, and that the court should have granted the divorce based

---

[12] Husband does not include in his argument the debt associated with the Fidelity 401k account awarded Wife.

on his initial complaint on the ground of irreconcilable differences. Wife misunderstands the procedural posture of the case. The Amended Complaint merely added a ground for the divorce; the case proceeded to trial on the allegations of the original complaint, as so amended. The divorce was granted to Husband on the ground of inappropriate marital conduct, which was a ground stated in the original complaint. There was no error in this regard.

### 3. *Vexatious Litigant*

Lastly, Wife contends that Husband "is a vexatious litigant and this court should so find and impose restrictions on [Husband's] ability to initiate litigation in the future." In this appeal we review the Final Decree of Divorce. The trial court did not make any ruling with regard to the manner in which the case was litigated, which we are asked to review and, on the record in this court, we find no basis to address the conduct of either party.

## III. CONCLUSION

For the reasons set forth above, the judgment of the Circuit Court is affirmed. The case will be remanded for such further proceedings as may be necessary to implement the orders of the trial court.

_____
RICHARD H. DINKINS, JUDGE

16