Robert Kendall BROADBENT

v.

Shari Katherine Langhi BROADBENT.

Supreme Court of Tennessee,
at Nashville.

June 7, 2006 Session.

Oct. 19, 2006.

Denty Cheatham and Rose Palermo, Nashville, Tennessee, for the appellant, Shari Katherine Langhi Broadbent.

Thomas F. Bloom, Nashville, Tennessee, for the appellee, Robert Kendall Broadbent.

## OPINION

JANICE M. HOLDER, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and E. RILEY ANDERSON, ADOLPHO A. BIRCH, JR., and CORNELIA A. CLARK, JJ., joined.

This appeal involves the trial court's award of alimony *in solido* to the wife. The trial court compared the parties' relative responsibility for the loss of wife's separate assets, which the husband had invested in the stock market and aggressively traded. The trial court concluded

that the wife was 30% responsible for the loss of her separate funds and that the husband was 70% responsible for her loss. Using these percentages, the trial court ordered the husband to pay $51,500 in alimony *in solido*. We conclude that it was proper for the trial court to consider the husband's participation in the loss of the wife's separate assets in awarding alimony. The trial court's allocation of responsibility for this loss, although expressed in percentages of "comparative fault" rather than relative fault, was not error. Accordingly, we hold that the trial court did not abuse its discretion in awarding $51,500 in alimony *in solido* to the wife.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises out of a divorce action. The appellant, Shari Katherine Langhi Broadbent ("Ms. Langhi"), began dating the appellee, Robert Kendall Broadbent ("Mr. Broadbent"), in 1996. Ms. Langhi, a kindergarten teacher, lived in a condominium in which she and each of her parents owned a one-third interest. Mr. Broadbent, a telecommunications analyst, lived in a house a few miles away from Ms. Langhi's residence. Ms. Langhi's parents regularly gave her substantial gifts of money. Before she met Mr. Broadbent, Ms. Langhi deposited funds she received from her parents in savings accounts and certificates of deposit for her retirement.

Mr. Broadbent traded heavily in the stock market. In 1998, prior to their marriage, Mr. Broadbent helped Ms. Langhi open accounts in which she began to deposit the gifts from her parents. Ms. Langhi initially placed $30,000 in an investment account and $2,000 in an individual retirement account ("IRA"). Ms. Langhi testified that she asked Mr. Broadbent to invest her money only in blue chip stocks to decrease the risk associated with the investments. In October 1999, Ms. Langhi signed a Limited Power of Attorney to provide Mr. Broadbent with direct access to her accounts. A Margin Agreement/Loan Consent Agreement, which Ms. Langhi denies signing, permitted Mr. Broadbent to trade on margin[1] with her accounts. On November 30, 1999, the margin debt on Ms. Langhi's investment account was $51,569.17.

Mr. Broadbent and Ms. Langhi married on December 4, 1999, and Ms. Langhi's account statements began to be mailed to Mr. Broadbent's residence in February 2000. The parties' living arrangements remained the same, with Ms. Langhi living in the condominium and Mr. Broadbent living in his house. The parties did not live together, in part, because they were looking for their "dream home." The margin debt on Ms. Langhi's investment account decreased to $31,108.06 in December 1999. In January 2000, Ms. Langhi deposited an additional $51,338.58 in her investment account. At the end of January 2000, the net value of the investment account was $102,000, but the margin debt on the account was approximately $125,000. The stock market declined in 2000. Ms. Langhi's accounts, which Mr. Broadbent had invested mainly in technology stocks, declined as well.

---

1. "Margin" is defined by the U.S. Securities and Exchange Commission ("SEC") as "borrowing money from your broker to buy a stock and using your investment as collateral." The SEC further explains that "[i]nvestors generally use margin to increase their purchasing power so that they can own more stock without fully paying for it. But margin exposes investors to the potential for higher losses." Margin: Borrowing Money to Pay for Stocks, http://www.sec.gov/investor/pubs/margin.htm (last visited September 1, 2006).

After the parties separated in January 2001, Ms. Langhi contacted the investment firm in which her accounts were held and was told that her investment account balance was approximately $17,000. According to Ms. Langhi, when she questioned Mr. Broadbent about the account balance, he denied that the balance that had been reported to her was correct. Ms. Langhi testified that she was unaware Mr. Broadbent was trading on margin with her accounts until she received a margin call[2] in April 2001. Mr. Broadbent, however, testified that he had many conversations with Ms. Langhi about the losses, and Mr. Broadbent's mother testified that in 2000 Ms. Langhi told her that she and Mr. Broadbent "lost quite a bit of money in the stock market."

Mr. Broadbent filed for divorce in May 2001 in the Circuit Court for Davidson County. Ms. Langhi filed a counterclaim for divorce in August 2001. She argued that Mr. Broadbent "entered into a calculated campaign to deprive [her] of a substantial amount of her separate funds ... to indulge his hi-tech gambling addiction by day-trading stocks on the Internet." She alleged that Mr. Broadbent "dissipated" approximately $80,000 of her separate funds through his aggressive stock market trading and that she was entitled to be reimbursed for the loss of these funds. Ms. Langhi also stated that she and Mr. Broadbent had not acquired any marital property during their brief marriage.

The trial court granted Ms. Langhi a divorce on the ground of inappropriate marital conduct. The trial court determined Ms. Langhi lost $83,000 in her investment account and would have lost only $11,000 if her investments had remained in blue chip stocks. The trial court further determined that Ms. Langhi would have lost only $1,500 in her IRA, rather than $4,000–$6,000, if her investments had remained in blue chip stocks. The trial court therefore determined that Ms. Langhi lost a total of approximately $75,000 of her separate funds due to Mr. Broadbent's "obsession with the stock market." The trial court then compared the relative responsibility for the loss. The trial court found that Ms. Langhi "had probable knowledge of the stock market problems" and concluded Ms. Langhi was 30% responsible and Mr. Broadbent was 70% responsible for the loss of Ms. Langhi's funds. Using these percentages, the trial court ordered Mr. Broadbent to pay $51,500 as alimony *in solido* and 70% of Ms. Langhi's attorney's fees. The trial court stated that its analysis was "similar to comparative negligence in torts." The Court of Appeals affirmed the trial court's award of attorney's fees but reversed the award of alimony *in solido*, holding that the trial court's use of a comparative fault analysis was "not the proper test for determining whether Mr. Broadbent dissipated Ms. Langhi's savings." We granted review.

## II. ANALYSIS

At issue in this case is the use of alimony *in solido* to replace the loss of a portion of Ms. Langhi's separate property for which the trial court held Mr. Broadbent responsible. We review the trial court's findings of fact de novo upon the record of the trial court, accompanied by a presumption of the correctness of these findings, unless the evidence preponderates otherwise. Tenn. R.App. P. 13(d);

2. According to the SEC, when a person's account falls below the brokerage firm's maintenance requirement, the firm generally will make a "margin call" asking for more cash or securities to be deposited into the account. Margin: Borrowing Money to Pay for Stocks, http:// www.sec.gov/investor/pubs/margin.htm (last visited September 1, 2006).

*Langschmidt v. Langschmidt,* 81 S.W.3d 741, 744 (Tenn.2002). We give great weight to the trial court's findings involving the credibility of witnesses because the trial court is in a better position to weigh and evaluate the credibility of witnesses. *Randolph v. Randolph,* 937 S.W.2d 815, 819 (Tenn.1996). With respect to the trial court's conclusions of law, however, our review is de novo with no presumption of correctness. *Ganzevoort v. Russell,* 949 S.W.2d 293, 296 (Tenn.1997).

Trial courts have broad discretion in awarding spousal support. *Bratton v. Bratton,* 136 S.W.3d 595, 605 (Tenn. 2004). "Accordingly, '[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes.' " *Bogan v. Bogan,* 60 S.W.3d 721, 727 (Tenn.2001) (quoting *Kinard v. Kinard,* 986 S.W.2d 220, 234 (Tenn.Ct.App.1998)). The role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable. *Id.* at 733. Thus, this Court gives awards of alimony an abuse of discretion review. *See Bratton,* 136 S.W.3d at 605.

### Dissipation

We begin by analyzing the Court of Appeals' conclusions with regard to dissipation. The Court of Appeals held that the trial court incorrectly used a comparative fault analysis to determine whether Mr. Broadbent dissipated Ms. Langhi's separate assets. We are unpersuaded that the trial court's inappropriate use of the term "comparative fault" is fatal to the trial court's analysis. Moreover, we are unable to conclude that the trial court's ruling was based upon a dissipation analysis.

In equitably dividing marital property, the trial court must consider the contribution of each party to the acquisition, preservation, appreciation, depreciation, or dissipation of the parties' marital or separate property. Tenn.Code Ann. § 36–4–121(c)(5) (2001). Although this statute does not define "dissipation," the term typically refers to the use of funds after a marriage is irretrievably broken. *See, e.g., Altman v. Altman,* 181 S.W.3d 676, 681–82 (Tenn.Ct.App.2005) (observing that dissipation of marital property occurs "when the marriage is breaking down"). Thus, dissipation generally occurs in contemplation of the dissolution of a marriage.

Dissipation of separate property may be relevant to the equitable division of marital property in at least two circumstances. First, the appreciation of separate property during the course of the marriage may be classified as marital property if each party substantially contributed to its preservation and appreciation. Tenn.Code Ann. § 36–4–121(b)(1)(B) (2001). The dissipation of separate property may therefore affect the total value of the marital property to be equitably divided. Second, dissipation of separate property may affect the separate assets of one spouse. The separate assets of each party are factors to consider in the equitable division of marital property. *Id.* at (c)(6).

In the present case, the loss of a portion of Ms. Langhi's separate funds occurred while the parties were planning to purchase a "dream home," not during a time when the marriage was irretrievably broken. Even if dissipation would be proper to consider, the parties have no marital property to divide. Pursuant to Tennessee Code Annotated section 36–4–121(c)(5) (2001), dissipation, whether of marital or separate property, must be considered only in the context of the division of marital property.

After a thorough review of the record and the trial court's ruling in this case, however, we find no reference to "dissipation" as the basis for the trial court's award of alimony *in solido*. The trial court considered the responsibility of each party for the loss of a portion of Ms. Langhi's separate assets. As explained below, this consideration is appropriate to take into account in determining the type and amount of alimony to be awarded to a disadvantaged spouse.

## Alimony *in Solido*

■ In making its alimony determination, a trial court must consider the factors listed in Tennessee Code Annotated section 36–5–101(d)(1)(A)–(L) (2001).[3] *Robertson v. Robertson*, 76 S.W.3d 337, 338 (Tenn.2002). The trial court in this case did not specifically recite the factors it considered in determining its alimony award. We, however, have carefully examined the record in light of the factors set forth in Tennessee Code Annotated section 36–5–101(d)(1)(A)–(L) (2001) and conclude that the evidence preponderates in favor of the trial court's judgment. *See Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn.2000) (stating that when a trial court has made no findings of fact regarding the relevant statutory factors, an appellate

3. At the time of the trial and judgment in this case, Tennessee Code Annotated section 36–5–101(d)(1) provided as follows:

   It is the intent of the general assembly that a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. Where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection, then the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient except as otherwise provided in subdivision (a)(3). Rehabilitative support and maintenance is a separate class of spousal support as distinguished from alimony in solido and periodic alimony. In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:
   (A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
   (B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to

   secure further education and training to improve such party's earning capacity to a reasonable level;
   (C) The duration of the marriage;
   (D) The age and mental condition of each party;
   (E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
   (F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;
   (G) The separate assets of each party, both real and personal, tangible and intangible;
   (H) The provisions made with regard to the marital property as defined in § 36–4–121;
   (I) The standard of living of the parties established during the marriage;
   (J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
   (K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and
   (L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.
   The current amendments to the alimony statute are codified at Tennessee Code Annotated section 36–5–121 (2005).

court must conduct its "own independent review of the record to determine where the preponderance of the evidence lies").

■ The trial court awarded Ms. Langhi alimony *in solido.* Alimony *in solido* consists of a definite sum of money that is paid in a lump sum or in installments over a definite period of time. *Burlew v. Burlew,* 40 S.W.3d 465, 471 (Tenn. 2001). It may not be modified. *Id.* The two most relevant factors in determining the amount of alimony awarded are the economically disadvantaged spouse's need and the obligor spouse's ability to pay. *Robertson,* 76 S.W.3d at 342. Tennessee Code Annotated section 36–5–101(d)(1)(A) (2001) provides that in making an alimony award a court shall consider all relevant factors, including "[t]he relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources." In addition, in making an award of spousal support, courts should consider the separate assets of each party and the provisions made with regard to the marital property. Tenn. Code Ann. § 36–5–101(d)(1)(G), (H) (2001). The trial court found that at the time the parties married, Ms. Langhi earned $33,000 per year, while Mr. Broadbent earned $72,000 per year. Ms. Langhi has less earning capacity and less ability to accumulate assets and savings than Mr. Broadbent and is therefore economically disadvantaged in comparison to Mr. Broadbent. Furthermore, Ms. Langhi's marriage to Mr. Broadbent adversely affected her financial condition. She began the marriage with separate assets that were rapidly diminished by Mr. Broadbent's stock market trades. "[T]he amount of alimony should be determined so 'that the party obtaining the divorce [is not] left in a worse financial situation than he or she had before the opposite party's misconduct

brought about the divorce.'" *Aaron v. Aaron,* 909 S.W.2d 408, 410–11(Tenn.1995) (quoting *Shackleford v. Shackleford,* 611 S.W.2d 598, 601 (Tenn.Ct.App.1980) (citations omitted)). The couple did not acquire any marital property, so the trial court could not adjust the division of marital property to compensate Ms. Langhi for her loss.

■ Another factor a court may consider in determining whether an award of alimony is appropriate is the duration of the marriage. Tenn.Code Ann. § 36–5–101(d)(1)(C) (2001). Especially in a marriage of short duration, trial courts attempt to place the parties as nearly as possible in the financial positions they occupied before the marriage took place. *See Batson v. Batson,* 769 S.W.2d 849, 859 (Tenn.Ct.App.1988). Given the extremely short duration of the marriage in this case, the primary goal should be to place the parties in approximately the same position they were in before the marriage. The trial court correctly attempted to restore the parties to their pre-marriage financial condition. It is clear that the alimony awarded by the trial court was to compensate Ms. Langhi for the decrease in the value of her separate property during the marriage.

Finally, the trial court may consider the relative fault of a spouse and "such other factors ... as are necessary to consider the equities between the parties" in making a spousal support award. Tenn.Code Ann. § 36–5–101(d)(1)(K), (L) (2001). The weight of the evidence shows that Mr. Broadbent is more responsible for the end of the parties' marriage than Ms. Langhi. The trial court awarded the divorce to Ms. Langhi and found that Mr. Broadbent's "obsession with the stock market ruined [Ms. Langhi's] savings and left her with virtually nothing." The trial court clearly considered Mr. Broadbent's relative fault

when calculating the alimony award. We conclude that it was proper for the trial court to consider Mr. Broadbent's participation in the loss of Ms. Langhi's separate assets in awarding alimony. Moreover, the trial court's allocation of responsibility for this loss, although expressed in percentages of "comparative fault" rather than relative fault, was not error. Accordingly, we hold that the trial court did not abuse its discretion in awarding $51,500 in alimony *in solido* to Ms. Langhi.

## III. CONCLUSION

We reverse the judgment of the Court of Appeals with regard to the award of $51,500 in alimony *in solido,* reinstate the trial court's judgment, and remand the case to the trial court for further proceedings consistent with this opinion. Costs of this appeal are taxed to the appellee, Robert Kendall Broadbent, and his surety, for which execution may issue if necessary.