IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 7, 2023 Session

**ANDREW FRANCIS TITTLE v. DEIDRE LYN DEYOUNG TITTLE**

**Appeal from the Chancery Court for Williamson County**
**No. 21CV-50282     Joseph A. Woodruff, Chancellor**

_____

**No. M2022-01299-COA-R3-CV**

_____

This is a divorce action in which the trial court awarded the wife a divorce based on the husband's inappropriate marital conduct, divided the marital estate and awarded the wife, inter alia, child support as well as transitional alimony of $2,000 per month for four years, followed by $1,500 per month for two years, then $1,000 per month for two years, and $500 per month for two years. The court also awarded the wife alimony in solido of $50,000 as necessary spousal support and an additional $75,000 to defray the cost of most of her attorney's fees. The husband appeals. We have determined that the record contains an inconsistency concerning the amount of the work-related childcare expenses the husband is required to pay, and it appears that the trial court failed to consider the husband's obligation to pay work-related childcare costs in setting transitional alimony at $2,000 per month during the first four years, which additional expense appears to impair the husband's ability to pay that amount. Accordingly, we vacate the award of child support and that portion of the transitional alimony award and remand these issues for reconsideration, taking into account, inter alia, the allocation of childcare expenses, the wife's need, and the husband's ability to pay. We affirm the trial court in all other respects. Both parties seek to recover the attorney's fees and costs each incurred in this appeal. Exercising our discretion, we deny both requests.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Vacated in Part; Affirmed in Part; and Remanded**

FRANK G. CLEMENT, JR., P.J., M.S. delivered the opinion of the court, in which W. NEAL MCBRAYER and KENNY ARMSTRONG, JJ., joined.

Amanda Raye Thornton and Corey T. Coleman, Nashville, Tennessee, for the appellant, Andrew Francis Tittle.

Sarah Richter Perky, Franklin, Tennessee, for the appellees, Deidre Lyn DeYoung Tittle.

# OPINION

## Facts and Procedural History

The parties met in 2011 in Michigan, where Deidre DeYoung Tittle ("Wife") was employed full time as a case worker for Michigan Department of Children's Services, while Andrew Tittle ("Husband") was employed by his father, Otto Tittle, for Aireconomics, Inc. ("AirEcon"). In 2013, Husband's father offered him the opportunity to move to Middle Tennessee to become the principal manager of AirEcon's operations in the region. Husband accepted, and the parties moved to Tennessee where they continued their domestic partnership. Wife began working for the Tennessee Department of Children's Services, and Husband continued working for AirEcon in his new position.

The parties married on September 13, 2014, and purchased a home in Williamson County the following February. Their only child, Alex, was born in January of 2018. Wife agreed to work part-time after Alex was born in order to care for the home and their child. In March 2021, Husband moved out of the marital home, first into his parents' condominium, then into an apartment that his father had leased. He then filed a petition for divorce, claiming irreconcilable differences, later amended to add inappropriate marital conduct. Wife's counter-complaint also cited irreconcilable differences, but alleged, in the alternative, that Husband was guilty of inappropriate marital conduct. In May 2021, after Husband denied Wife access to marital funds that maintained the marital home and the care of their three-year-old son, Wife filed a motion for reinstatement of access to credit card, for pendente lite support, to maintain financial status quo, and for exclusive possession of the marital residence. The court entered a pendente lite agreed order, reinstating Wife's access to the credit card and awarding her exclusive possession of the marital home. A few months later, Wife filed an emergency motion for contempt and for wage garnishment after Husband refused to pay the court-ordered support. The court then ordered Husband to pay by wage assignment. The marital home was then sold pursuant to Husband's motion and the court's subsequent order, from which Wife was awarded a portion to cover her moving costs, as well as $9,140 from Husband's portion for support that was still owed to Wife as a result of Husband's nonpayment.

A hearing was held for three days in July 2022, after which the trial court issued a fifty-page memorandum and order detailing its findings and determinations. Significantly, the court found Wife to be more credible than Husband, stating that it "has no confidence in Husband's credibility" and noting that he, among other things, "changed his testimony to suit the exigencies of circumstances."

The court found that Husband was 38 years old at the time of divorce and employed at his father's company, AirEcon, as an engineer with an engineering degree from Purdue University and NEBB, CP, and LEED certifications in building construction management. It also noted that Husband's Social Security statements reflected gross wages of $145,200

in 2019 and $146,600 in 2020, and that Husband also had the use and benefit of a company vehicle and a business credit card, both of which he routinely used for personal purposes. Furthermore, the court found and stated:

> [Husband] grossly understated his income as $103,999.92 per year on his sworn income and expense statement and the proof showed that he colluded with his father to artificially reduce his salary days before filing for divorce in an effort to commit a fraud on the Court and avoid his financial responsibilities to his wife and child. [Husband] earned $146,600 per year twenty-five (25) days before he filed for divorce. [Husband] also failed to include the significant untaxed fringe benefits he received from employment by his father totaling an additional $57,844.61 per year including a cellular telephone, a 2020 Toyota 4Runner, car insurance, health insurance, automotive expenses, bills and utilities, entertainment, food and beverages, gasoline, health and wellness, merchandise, repairs and maintenance, and travel. [Husband] admitted that he fully intended and expected to take over as owner of Aireconomics, Inc. after the divorce.

(Citations to the record omitted).

With regard to the issue of transitional and in solido alimony, the court made the following findings:

> Husband has an earning capacity five times greater than Wife. Wife's resources are limited to her ability to earn income from gainful employment and Husband's faithful payment of child support over the next fourteen years. Husband, on the other hand, not only has a well-paying job in an esoteric field for which he has been specially trained and qualified, but he also has the very reasonable expectation that he will one day be the successor to the successful business his father has built and which provides him a livelihood. Husband is obligated to provide financially for his son until the child is emancipated, and to provide adequate and sufficient financial resources for Wife to adjust to the change in circumstances Husband has brought about.
>
> Over the near and medium term, Wife is facing the prospect of making substantially greater adjustments to her life than is Husband. The parties are both college-educated. Both have a track-record of employment in a field related to their formal education; Wife's degree is in psychology, Husband's degree is in engineering. Wife's most obvious path to secure more lucrative employment, and improve her earning capacity within the healthcare arena, depends upon her ability to secure further education and licensure as a registered nurse. Wife testified that there are educational opportunities available to her in Middle Tennessee where she can pursue either an associate

- 3 -

or bachelor degree in nursing. She expressed an ambition to one day become a registered nurse practitioner. Statistics from the federal bureau of labor statistics reflect that nurses and nurse practitioners in Tennessee can earn more than three-times what Wife can earn in her current job. Wife did not present sufficient facts, however, for the Court to determine whether an award of rehabilitative alimony was appropriate where the amount is tied to the expenses associated with a particular course of study. Nevertheless, Wife clearly needs financial support to adjust to the economic consequences of divorce, which include improving her capacity to earn income. Wife is capable of earning income, increasing her earning capacity over time, and eventually becoming self-sufficient. Therefore, she is not an appropriate candidate for permanent alimony. Husband has all of the formal training and certifications he requires to prosper in his chosen field.

Based on these and other findings, the court awarded Wife a divorce on the ground of inappropriate marital conduct, due to Husband's "financial duplicity" and abuse of alcohol. The court pointed to evidence of Husband's "financial chicanery" with his father, obscuring Husband's actual income and benefitting Husband with "constructive undeclared income." It also noted evidence of Husband's alcohol abuse, including an event when Husband had driven while intoxicated.

The court then divided the marital estate awarding Wife $238,522 and Husband $151,140, representing approximately 61% and 39%, respectively, of the net marital estate, little of which was income-producing. The court also approved a parenting plan and awarded Wife child support in the amount of $1,190 per month.

The parenting plan states in Section J. #6, that Husband "shall be responsible for directly and timely paying the cost of **all work-related childcare** for the minor child," which was listed as $1,624 per month.[1] (Emphasis added). However, as Husband states in his appellate brief, the child support worksheet credits Wife with $307 and Husband with only $1,317 of the work-related childcare costs. Therefore, relying on the child support guidelines, which provide that the party paying work-related childcare expenses is entitled to a credit for the same on the child support worksheet, Husband contends he is being deprived of a credit in the amount of $307 monthly and, conversely, Wife is being credited, unjustly, in the same amount.

Conversely, as Wife correctly notes, the trial court's final order states that the parties agreed that Alex would remain in his current preschool setting for the coming academic year and that "[t]he Court allocates to each party their pro rata shares of this monthly cost;

---

[1] These childcare costs were expected to terminate when Alex started kindergarten in the fall of 2023.

Husband's share per month is $1,317 and Wife's share is $307."[2] The credits reflected on the child support worksheet mirrors this language. Thus, among the final order, the approved parenting plan, and the child support worksheet, there is conflicting language that creates a question of whether 1) Husband is responsible for paying all of the childcare expenses, in the amount of $1,624 per month, or 2) Husband is responsible for $1,317 of the work-related childcare costs, with Wife being responsible for the balance.

As for the award of transitional alimony, the court used Wife's projected monthly income of $2,503.20 and expenses of $5,728.86 to calculate a cash-flow deficit of $3,225.66. Then, adding Husband's child support obligation of $1,190, the court's final order states that it determined Wife's monthly cash-flow deficit to be $4,538.86; however, this was a mathematical error. Based on the numbers listed, her deficit was $2,035.66, which is the amount the court relied upon in setting alimony.[3]

The court acknowledged that Husband's gross income was "harder to determine" because of the "gamesmanship" used to "create the appearance" of Husband's reduced income. Therefore, the court used a three-year average of Husband's income plus his estimated fringe benefits in determining his gross annual income to be $158,700. Determining that wife "clearly needs financial support to adjust to the economic consequences of divorce," the court awarded alimony *in solido* in the amount of $50,000 to be paid directly to Wife from Husband's share of the marital estate being held by the court. The court also awarded transitional alimony in the amounts of $2,000 per month for four years, followed by $1,500 per month for two years, then $1,000 per month for two years, and $500 per month for two years. Additionally, the court awarded Wife alimony in solido of $50,000 as necessary spousal support to defray the monthly deficits she was expected to incur as her transitional alimony payments decreased over time.

As for attorney's fees, the court noted that Wife had incurred a total of $116,284.09 in attorney's fees and expenses, with $74,756.53 outstanding while Husband reported $13,500 in outstanding attorney's fees. The court considered the complications caused by Husband's changing counsel multiple times, his "litigation tactics, failure to cooperate fully in discovery, and efforts to obtain financial leverage over Wife," requiring Wife to seek "relief from the court to obtain and enforce *pendente lite* support orders," as well as Wife's need and Husband's ability to pay and awarded Wife alimony *in solido* in the amount of $75,000 for reimbursement of a portion of her attorney's fees and other expenses.

This appeal followed.

---

[2] This provision appears on page 36 of the final order.

[3] Both parties agree that this was a mathematical error, with the trial court adding the child support amount to Wife's deficit instead of subtracting it. As Wife correctly notes on appeal, "however, all the variables upon which the alimony calculation were made are correct and supported by the record."

## Issues

Husband raises the following issues:

1.      Whether the trial court erred in finding [Husband] suffered untreated alcohol addiction despite there being no credible evidence supporting this conclusion.

2.      Whether the trial court erred in the amount and duration of transitional alimony and amount of alimony *in solido* awarded to [Wife], and whether the trial court failed to consider [Husband's] ability to pay.

3.      Whether the trial court erred in crediting [Wife] with a portion of the work-related childcare while simultaneously ordering [Husband] to pay the costs in full.

4.      Whether the trial court erred in awarding attorney fees to the [Wife], and whether the court erred in the amount of attorney fees awarded.

5.      That [Husband] be awarded attorney fees and costs incurred in bringing this appeal.

For her part, Wife seeks to recover her attorney's fees and expenses incurred on appeal and insists that Husband is not entitled to recover his costs.[4]

## ANALYSIS

### I.      HUSBAND'S ALCOHOL CONSUMPTION

For his first issue, Husband contends that the trial court erred in finding that Husband "suffered untreated alcohol addiction despite there being no credible evidence supporting this conclusion." Furthermore, and as he states in his appellate brief, Husband contends that his alcohol consumption was "a major consideration in the court's finding that said usage constituted inappropriate marital conduct and, further, that said conduct was a relevant consideration when awarding [Wife] alimony."

For her part, Wife correctly states that the trial court awarded her the divorce on the ground of Husband's inappropriate marital conduct based on two separate circumstances,

---

[4] Wife also contends that Husband should be precluded from any relief on appeal under the doctrine of unclean hands. We respectfully disagree.

Husband's "financial duplicity"[5] and abuse of alcohol,[6] and she contends that there was more than sufficient evidence to support each finding.

Significantly, Husband does not challenge the trial court's finding that Husband's "financial duplicity is inappropriate marital conduct." Because Husband's conduct of financial duplicity was a separate basis upon which the court found that Husband had engaged in inappropriate marital conduct, we affirm the trial court's decision to award Wife the divorce based on Husband's inappropriate marital conduct.

We shall now address Husband's contentions that the evidence preponderates against the trial court's findings regarding his consumption of alcohol. For her part, Wife contends there was more than sufficient evidence to support the court's findings.

In cases where the action is "tried upon the facts without a jury," Tennessee Rule of Civil Procedure 52.01 provides that the trial court "shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." If the trial court makes the required findings of fact, the trial court's factual findings are reviewed de novo, accompanied by a presumption of the correctness of the finding of fact, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *see Boarman v. Jaynes*, 109 S.W.3d 286, 290 (Tenn. 2003). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999).

We also give great deference to the trial court's credibility assessments. *See Watson v. Watson*, 309 S.W.3d 483, 490 (Tenn. Ct. App. 2009). Also, we do not disturb "factual findings based on witness credibility unless clear and convincing evidence supports a different finding." *Coleman Mgmt., Inc. v. Meyer*, 304 S.W.3d 340, 348 (Tenn. Ct. App. 2009) (citing *Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315–16 (Tenn. 1987).

Before the parties met, Husband pled guilty to vehicular homicide due to intoxication in Michigan for which he was sentenced to probation, the conditions of which required Husband to abstain from consuming alcoholic beverages and to participate in a

---

[5] The trial court found that Husband engaged in "financial chicanery" and "financial duplicity" in concert with his father, who controlled the company for which Husband had been employed for years. The court found the chicaner and duplicity included Husband's annual salary being reduced by $48,000 annually immediately prior to moving out of the marital home and filing for divorce, and Husband cutting Wife off from all credit cards and bank accounts. Based on these and other findings, the trial court held that "this financial duplicity is inappropriate marital conduct."

[6] The trial court found that "Husband's abuse of beverage alcohol also amounts to inappropriate marital conduct."

twelve-step recovery program for alcohol abuse disorder. Husband completed his probation without a violation. After completing probation, Husband relocated to Tennessee at which time he resumed drinking alcoholic beverages. As the trial court found, his drink of choice is beer, and he routinely consumes several beers every day; a couple of witnesses testified that he occasionally drinks to the point of intoxication.

Wife's sister-in-law, Hilary DeYoung, testified that Husband was "very focused" on drinking alcohol when she visited and that he would insist on driving a vehicle after drinking even when there were sober adults available to drive. Mrs. DeYoung testified that she believed Husband had a problem with alcohol based on her interactions with him. Wife testified, and the trial court found, that "excessive consumption of alcohol is part of the family culture within which Husband was raised." Specifically, Wife testified that when Husband is around his parents, particularly during visits at the parents' home in Florida, Husband increases the amount he consumes.

One incident in particular drew the court's attention. It was on Wife's birthday in February of 2021. Although Wife had informed Husband that she planned to cook dinner for the family that evening, Husband informed Wife that he was going to a friend's farm. When he returned home around 8:30 p.m., he appeared to be intoxicated. Although he missed the family birthday dinner, Wife testified that he attempted to disrupt their minor child's bedtime routine. When Wife objected and expressed concern to Husband about his alcohol consumption, he defensively told her that he "could have a drink if he wanted" and he just "wanted to relax." As the trial court described it in the final order:

> The precipitating events for Husband's decision [to get a divorce] began to unfold over the weekend of Wife's birthday. February 26. On Sunday, February 28, 2021, Husband spent the afternoon in the company of two of his male friends drinking beer. When he returned home that evening, he was noticeably intoxicated, and Wife, who had been on her own caring for their child, was irritated with him.

The trial court also found that:

> [Husband] routinely drinks several beers every day and often drinks to the point of intoxication. Excessive consumption of alcohol is part of the family culture within which Husband was raised. After their child was born, Wife urged Husband to moderate his alcohol consumption by drinking less; Husband responded to Wife's pleas by insisting he did not have an alcohol problem.

(Footnote omitted).

Moreover, and significantly, the trial court credited Wife's testimony over that of Husband. In fact, the discussion of the issues in the trial court's final order begins with the following credibility findings:

Determining the facts of this case requires the Court to assess the relative credibility of the witnesses. Having done so, the Court finds Wife to be more credible than Husband.

Wife's testimony was coherent and plausible. She answered questions directly, even on cross examination, without evasion or equivocation. She clearly blames Husband for the failure of the marriage, but apart from this bias (which is not unreasonable), Wife's testimony was not impeached. Her emotional affect and demeanor while testifying were consistent with those of a person testifying truthfully.

Husband's testimony lacked these essential hallmarks of trustworthiness and reliability. His testimony was often contradictory. He changed his testimony to suit the exigencies of circumstances, and his accounts of facts were frequently subject to revision. Husband's conduct during discovery was characterized by repeated unexcused failures to produce responsive documents in his possession or control. Therefore, when Husband testified about financial matters he claimed would be corroborated by documents he never produced, the Court took an adverse evidentiary inference; namely, that no such corroborative documents existed or, if such documents existed, they would contradict rather than support Husband's factual assertions.

Husband's demeanor and emotional affect while testifying were inconsistent with those of a person attempting to testify honestly. Not all of his testimony was contradicted by Wife, however, and the Court has no reason to discount Husband's concessions and agreements to facts that benefitted Wife's position. But to the extent that Husband relies upon his uncorroborated testimony to carry his burden of proof on matters to which Wife has offered contrary testimony, the Court has no confidence in Husband's credibility.

As noted earlier, we give great deference to the trial court's credibility assessments, *see Watson v. Watson*, 309 S.W.3d at 490, and we do not disturb "factual findings based on witness credibility unless clear and convincing evidence supports a different finding." *Coleman Mgmt., Inc. v. Meyer*, 304 S.W.3d at 348 (other citations omitted). Following a thorough review of this record, we have determined that the trial court's factual findings concerning Husband's lack of credibility do not support different or contrary findings. *See id.* Moreover, the trial court made the required findings of fact, and the evidence in this record does not preponderate against those findings. *See* Tenn. R. App. P. 13(d); *see also Boarman v. Jaynes*, 109 S.W.3d at 290.

Accordingly, we affirm the trial court's finding that Husband had an alcohol problem that adversely affected the marriage to the extent that it constituted inappropriate marital conduct.

## II. CREDIT FOR WORK-RELATED CHILDCARE EXPENSES

Husband contends the trial court erred in crediting Wife with a portion of the work-related childcare expenses while simultaneously ordering Husband to pay the costs in full. Wife counters insisting that the final order and the child support worksheet both correctly note that Wife pays $307 and Husband pays $1,317 of the preschool childcare costs. We have determined that they are both correct because there is a conflict within the court documents, specifically the final order, the permanent parenting plan, and the child support worksheet.

As Husband states, Section J. 6. of the Permanent Parenting Plan, which is incorporated in the final order, states: "Father shall be responsible for directly and timely paying the cost of all work-related childcare for the minor child." However, as he correctly notes, the child support worksheet credits Wife with $307 and Husband with $1,317 of the work-related childcare costs. Therefore, relying on the child support guidelines, which provide that the party paying work-related childcare expenses is entitled to a credit for the same on the child support worksheet, Husband contends that he is being deprived of a credit in the amount of $307 monthly and, conversely, Wife is being credited, unjustly, in the same amount.

Conversely, as Wife correctly notes, the trial court's final order states that the parties agreed that Alex would remain in his current preschool setting for the coming academic year and "[t]he Court allocates to each party their pro rata shares of this monthly cost; Husband's share per month is $1,317 and Wife's share is $307." The credits reflected on the child support worksheet mirrors this language.

Thus, Section J. 6. of the parenting plan allocates 100% of the work-related childcare costs to Husband, for which he is entitled to a credit, while the final order and the child support worksheet credits Wife for purportedly paying $307 of the monthly costs.

Because we are unable to resolve the conflict, we remand this issue to the trial court to clarify its intent, allocate the costs and credits as the court intended, and, if the trial court deems appropriate, modify child support accordingly.

## III. ALIMONY IN SOLIDO AND TRANSITIONAL ALIMONY

Husband contends that the trial court erred in the amount[7] of transitional alimony and amount of alimony in solido awarded to Wife. As part of this argument, Husband contends that the amount of alimony awarded exceeded Wife's need and that the trial court failed to consider Husband's ability to pay, which "resulted in an illogical outcome creating an injustice for [Husband]." For her part, Wife contends that the trial court properly exercised its discretion in determining the amount and duration of alimony.

As both parties acknowledge, Tennessee Code Annotated § 36-5-121(i) sets forth the factors a court is to consider when determining whether to award spousal support, and "the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay." *Riggs v. Riggs*, 250 S.W.3d 453, 457 (Tenn. Ct. App. 2007).

Trial courts have broad discretion in determining the amount of alimony, if any, and the type of alimony to be awarded in view of the circumstances of each particular case, and such awards will not be disturbed absent an abuse of that discretion. *See Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006); *Lindsey v. Lindsey*, 976 S.W.2d 175, 180 (Tenn. Ct. App. 1997). Thus, an appellate court reviews an award of alimony pursuant to the abuse of discretion standard. *Broadbent*, 211 S.W.3d at 220. More specifically, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Id*. An abuse of discretion occurs when the trial court causes an injustice by: (1) applying an incorrect legal standard, (2) reaching an illogical result, (3) resolving the case on a clearly erroneous assessment of the evidence, or (4) relying on reasoning that causes an injustice. *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). [W]hen reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision." *Id.* at 105–06.

The trial court found that Husband was not a credible witness, and as noted earlier, we give great deference to the trial court's credibility assessments. *See Watson v. Watson*, 309 S.W.3d at 490. Furthermore, the trial court found that Husband and his father, who controlled the company that employed Husband, engaged in "financial chicanery" in an attempt to hide or understate his salary and the economic benefits Husband receives from AirEcon. The trial court's findings regarding their financial chicanery include the following:

---

[7] Husband frames this issue as though he is also challenging the "duration" of transitional alimony; however, he makes no argument and cites no authority in his brief in support of this issue. *See* Tenn. R. App. P. 27(a)(7). "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Resp. of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010). Thus, the question of whether the evidence is sufficient to support an award of transitional alimony for the duration of ten years is waived.

As detailed *infra*, Husband also engaged with his father, Otto Tittle, in financial chicanery benefitting Husband with constructive undeclared income, culminating in a scheme calculated to make it appear that Husband's income had been reduced by $48,000 shortly prior to Husband filing for divorce. Otto Tittle is the undisputed controlling principal of AirEcon. Otto Tittle has a long-established practice of providing Husband use of the AirEcon company credit card for Husband's personal charges, and allowing Husband personal use of a vehicle titled to AirEcon but used by Husband as his primary means of personal transportation, all without reimbursement to AirEcon. Husband even invested marital funds into purchasing upgrades and alterations for the most recent AirEcon vehicle Husband drives. According to Husband's testimony, Otto Tittle suddenly and unilaterally reduced Husband's annual compensation by $48,000 effective on the last pay period of February 2021.

Husband separated from Wife on March 13, 2021. . . . On or about March 8 or 9. 2021, Husband claims to have informed his parents that he was going to initiate a divorce. Husband moved out of the marital residence on March 13, 2021, and spent the next two nights with another married couple in the neighborhood. He then temporarily stayed in his parent's condominium in the Green Hills area of Nashville.

On March 25, 2021, Otto Tittle executed a lease for a luxury apartment in Franklin with a monthly expense of $2,569.21. Husband moved into this apartment. There is no bona fide, enforceable agreement between Husband and Otto Tittle requiring Husband to reimburse Otto Tittle for the cost of this apartment. This arrangement between Husband and Otto Tittle is simply a constructive replacement of Husband's purportedly reduced income. There is no writing of any kind, and no credible evidence from any witness, from which any other inference could be drawn. This financial duplicity is inappropriate marital conduct.

(Footnotes omitted).

The trial court additionally found, in pertinent part, as noted earlier in this opinion, that:

Husband has an earning capacity five times greater than Wife. Wife's resources are limited to her ability to earn income from gainful employment and Husband's faithful payment of child support over the next fourteen years. Husband, on the other hand, not only has a well-paying job in an esoteric field for which he has been specially trained and qualified, but he also has

- 12 -

the very reasonable expectation that he will one day be the successor to the successful business his father has built and which provides him a livelihood. Husband is obligated to provide financially for his son until the child is emancipated, and to provide adequate and sufficient financial resources for Wife to adjust to the change in circumstances Husband has brought about.

Over the near and medium term, Wife is facing the prospect of making substantially greater adjustments to her life than is Husband. The parties are both college-educated. Both have a track-record of employment in a field related to their formal education; Wife's degree is in psychology, Husband's degree is in engineering. Wife's most obvious path to secure more lucrative employment, and improve her earning capacity within the healthcare arena, depends upon her ability to secure further education and licensure as a registered nurse. Wife testified that there are educational opportunities available to her in Middle Tennessee where she can pursue either an associate or bachelor degree in nursing. She expressed an ambition to one day become a registered nurse practitioner. Statistics from the federal bureau of labor statistics reflect that nurses and nurse practitioners in Tennessee can earn more than three-times what Wife can earn in her current job. Wife did not present sufficient facts, however, for the Court to determine whether an award of rehabilitative alimony was appropriate where the amount is tied to the expenses associated with a particular course of study. Nevertheless, Wife clearly needs financial support to adjust to the economic consequences of divorce, which include improving her capacity to earn income. Wife is capable of earning income, increasing her earning capacity over time, and eventually becoming self-sufficient. Therefore, she is not an appropriate candidate for permanent alimony. Husband has all of the formal training and certifications he requires to prosper in his chosen field.

.     .     .     .

Both parties must work outside the home, notwithstanding the allocation of residential parenting time. It is foreseeable that Wife's employment options, other than her current employment, may be limited by her status as the primary custodial parent with the greater share of residential parenting time; but, at present, Wife is able to meet the requirements of her job and perform all her parenting responsibilities. Husband testified that Otto Tittle cut his pay when Husband started keeping Alex on Thursdays. Assuming this is true, then Husband's financial interests are incompatible with exercising more parenting time than the Court has set in the permanent parenting plan.

Neither party has separate property they can use for generating income. Although Wife was awarded a slightly greater share of the marital estate,

Husband nevertheless has been awarded approximately $90,000 from the remaining undistributed proceeds from the sale of the marital residence. With annual income that has averaged greater than $150,000 over the last three years, Husband has a greater ability to pay marital debts, and to provide lump sum support to Wife in the near term, which may mitigate her need for support over a longer term.

.    .    .    .

Initially, both parties worked full time and contributed their incomes to each other. After the birth of their son, the parties agreed to organize their familial responsibilities so that Husband devoted his time and energy into generating income while Wife reduced her employment to part-time in order to have more time available for the responsibilities of homemaker and primary caregiving parent.

Husband is the party at fault for the demise of the marriage. He resumed and gradually increased his consumption of beverage alcohol notwithstanding his previous felony conviction for vehicular homicide involving intoxication. It was Husband's decision to separate from his family and file for divorce. Husband offered no credible evidence that Wife engaged in any inappropriate marital conduct. He and his father, Otto Tittle, contrived a scenario calculated to make it appear that Husband had less income than he actually received. Husband chose to pursue litigation tactics that unreasonably and unnecessarily increased Wife's attorney fees and expenses. His inappropriate marital conduct is a relevant factor to consider in determining the question of alimony.

At trial, Wife projected her net post-divorce monthly cash-flow to be a deficit of ($3,225.66). She projected net monthly income of $2,503.20 and total expenses of ($5,728.86). These projections do not include Wife's receipt of any child support from Husband. Using Wife's projected gross monthly income of $3,083.88, the Court has calculated Husband's child support obligation to be $1,190, thereby reducing Wife's negative monthly cash flow by that amount. This still leaves Wife with a net monthly cash-flow deficit of ($4,538.86).[8]

Husband submitted income and expense statements that understate his income and overstate his expenses. He purports to have gross income of only $104,000. As detailed in the computation of child support, Husband actually

---

[8] As noted earlier, Wife's deficit was actually $2,035.66, not $4,538.86. Importantly, the trial court applied the correct deficit of $2,035.66 when setting alimony instead of the erroneous figure of $4,538.86.

receives income, both direct compensation, and constructive income through fringe benefits, of more than $150,000. Husband is in the 20% marginal tax bracket for federal income taxes and is exposed to payroll taxes of 7.65%. Therefore, he has approximately $108,400 net, after-tax, annual income. This leaves Husband with $9,033 net after-tax income each month. The Court has determined Husband's child support obligation to be $1,190; therefore, Husband has $7,843 available income net of taxes and child support with which to pay for his monthly expenses and to pay alimony.

Husband claims he has monthly living expenses of $5,660, not including debt service on the $23,288 balance of the Chase credit card. Husband has sufficient liquid assets from the division of the marital estate with which to pay off the Chase credit card. Therefore, every month Husband has $2,183 net of taxes, child support and his personal living expenses with which to pay alimony. This is still an amount less than Wife's monthly cash flow deficit. An award of alimony *in solido* can mitigate Wife's monthly shortfall, and provide a cushion by which she can absorb it over time.

(Footnotes omitted).

Based on the foregoing facts and findings, as well as others, the trial court awarded Wife $2,000 per month for 48 months; followed by $1,500 per months for 24 months; followed by $1,000 per month for 24 months; followed by $500 per month for 24 months. It additionally awarded Wife alimony in solido in the amount of $50,000 to "mitigate Wife's monthly shortfall, and provide a cushion by which she can absorb it over time."

The court explained that its reasoning for the transitional alimony time frame of ten years was that "the period of time [was] necessary for Alex to complete the eighth grade. The declining amount of transitional alimony is calculated to incentivize Wife's reasonable efforts to achieve financial independence." The court also explained that the "award of transitional alimony shall be modifiable in both amount and duration in the event of a material change in circumstances during the period of the award."[9]

Husband contends that the awards exceed Wife's need and his ability to pay. Specifically, while addressing Wife's need, Husband argues:

The court found that [Wife's] net monthly income to be $2,503.20 and her total expenses to be $5,728.86. This results in a monthly deficit of $3,225.66. Next, the court states that Plaintiff's child support obligation of $1,190.00 should be applied to reduce [Wife's] negative monthly cash flow by an equal

---

[9] The court also ruled that the award of transitional alimony shall terminate upon Wife's death or remarriage and upon Husband's death.

amount. The court finds that this results in [Wife] having a net monthly cash flow of $4,538.86. However, adding $1,190.00 to $2,503.2 equals $3,693.20. Subtracting that amount from [Wife's] total expenses results in a monthly deficit of $2,035.66, not $4,539.86. The court overstates [Wife's] need.

We agree that Wife's monthly deficit was $2,035.66, not $4,539.86. Nevertheless, the record reveals that the trial court based its transitional alimony award on Wife having a deficit of a monthly deficit of $2,035.66, not $4,539.86. Although the trial court stated the wrong sum in one paragraph, the trial court's alimony ruling was not based on Wife having a monthly deficit of $4,539.86.

As both parties acknowledge in their briefs, both Husband and Wife have an effective deficit during the first four years. As for Wife, the amount of transitional alimony awarded to her was $2,000 per month for 48 months, which represents an apparent deficit to her of $35.66 per month, then she is scheduled to receive $1,500 per month for 24 months, which represents a deficit of $535.66 per month, and her deficit increases every two years as her transitional alimony decreases. At the same time, Husband has a deficit as well, but it appears that the amount of Husband's deficit during the first year or two, is incorrect because the trial court apparently failed to include Husband's work-related childcare for that period of time, which is either the entire amount of childcare, that being either $1,624, or a prorated share of $1,317.[10]

The alimony payments were to begin the first month following the entry of the final order, which was entered on September 16, 2022. Thus, the first alimony payment was due on October 1, 2022, and Husband was obligated to pay work related childcare until Alex started kindergarten. The record suggests that Alex was to being kindergarten the following fall, but that is not entirely certain. Thus, until Alex started kindergarten, Husband was obligated to pay either all of the childcare expense, which was listed as $1,624, or his prorated share, which was listed as $1,317, with Wife's share being $307. Regardless of which amount is correct, it appears that the trial court did not factor this expense in when determining Husband's ability to pay $2,000 of alimony during the first year or two following the divorce. Accordingly, Husband's deficit may be greater for the first year or two, depending on when Alex starts kindergarten, than anticipated by the trial court.

As for the remaining eight years of transitional alimony, Husband's deficit is diminished and then eliminated as his alimony obligation decreases, while Wife's deficit increases. Nevertheless, the trial court took Wife's ongoing deficit into consideration when it awarded Wife alimony in solido of $50,000 to bridge this gap.

For the foregoing reasons, we find that Husband's transitional alimony obligation for the first two years, or a portion of that period during which he pays childcare expenses,

---

[10] Which amount is correct is to be determined by the trial court on remand as noted above.

creates a burden on Husband that appears greater than he is able to pay. Thus, it may constitute an injustice to Husband. For this reason, we vacate the award of alimony for the first two years and remand the issue to the trial court to reconsider Husband's ability to pay in light of his obligation to pay all or a prorated portion of the work-related childcare and to modify the alimony award accordingly. We affirm the remainder of the award of transitional alimony, as well as the award of alimony in solido in the amount of $50,000 to aid Wife in the transition as her transitional alimony decreases.

## IV. ATTORNEY'S FEES INCURRED IN THE TRIAL COURT

Husband contends that the trial court erred in awarding Wife her attorney's fees incurred in the trial court proceedings. Husband does not dispute that the trial court applied the relevant factors and considered each in its determination. Nevertheless, he contends that the court incorrectly calculated both Wife's need and his ability to pay which "resulted in an illogical outcome creating an injustice for [Husband]." For her part, Wife contends that the trial court based its decision on a thorough weighing of the factors set forth in Tennessee Code Annotated § 36-5-121, and the award was justifiably based on Husband's "abuse of the litigation and discovery processes, financial duplicity, and dishonest and legally untenable positions." She also notes that the trial court only awarded her a portion of her attorney's fees.

In a divorce action, an award of attorney's fees constitutes alimony in solido. *Gonsewski*, 350 S.W.3d at 113 (citing Tenn. Code Ann. § 36-5-121(h)(1)(B)). When determining whether to award attorney's fees as alimony in solido, the trial court must consider: (1) the total amount of attorney fees and expenses paid by each party in connection with the proceedings; (2) whether the attorney fees and expenses requested are reasonable; (3) whether the attorney fees and expenses were necessary; and (4) the relevant factors regarding alimony set forth in Tennessee Code Annotated § 36-5-121(i). Tenn. Code Ann. § 36-5-121(h)(1)(B)). Such an award is only appropriate when the spouse seeking it lacks sufficient funds to pay his or her legal expenses or would be required to deplete his or her resources in order to pay them. *Gonsewski*, 350 S.W. 3d at 113.

An award of attorney fees in a divorce case is "within the sound discretion of the trial court, and unless the evidence preponderates against the award, it will not be disturbed on appeal." *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995) (citing *Lyon v. Lyon*, 765 S.W.2d 759, 762–63 (Tenn. Ct. App. 1988)).

The trial court's ruling on this issue is thorough and complete. After noting the professional expertise of Wife's trial counsel, Sarah Richter Perky, and the fact that she is representing Wife pursuant to an hourly-rate fee arrangement that is neither contingent nor fixed, the court stated in its order:

Her law firm maintains business records that capture and report the services rendered by billing professionals, along with the timekeeper's hourly rate, a narrative description of services provided, the time required for the services to be performed and the value of those services as calculated by multiplying the time invested by the timekeeper's hourly rate. From these business records, the Court finds Ms. Perky's initial hourly billing rate was $400 which is within the range of hourly rates customarily charged in this judicial district for contested divorce litigation between parents with minor children. As a cost containment measure, beginning in March, 2022 Ms. Perky reduced her hourly rate to $375. Throughout her representation of Wife, Ms. Perky, from time to time used the services of paralegals and other attorneys to perform tasks at a lower hourly rate than her own.

Ms. Perky's representation of Wife in this case was complicated in part by the fact Husband changed his own counsel more than once. Moreover. Husband's litigation tactics, failure to cooperate fully in discovery, and efforts to obtain financial leverage over Wife by deviating from the customary manner by which the family paid its monthly bills, created circumstances that required Wife to seek interlocutory relief from the court to obtain and enforce *pendente lite* support orders.

The issues in this case were made more complicated by Husband's efforts to conceal his income and not to cooperate in discovery. Nevertheless, Wife was the prevailing party in all respects.

From all of the foregoing, the Court concludes the services provided by Ms. Perky and her firm were necessary and Wife's attorney fees are reasonable in the aggregate amount of $116,284. The Court hereby awards Wife additional alimony in solido in the total amount of $75,000 representing Wife's unpaid attorney fees and expenses and partial reimbursement of attorney fees Wife has paid during the course of the litigation[.]

(Footnotes omitted).[11]

As noted earlier, the trial court made the express finding that

Husband's testimony lacked [the] essential hallmarks of trustworthiness and reliability. His testimony was often contradictory. He changed his testimony

---

[11] The order went on to state that Husband has the option to pay the attorney's fee award as follows: "$15,000 lump sum on the first day of September for the first five anniversaries of the entry of this Memorandum and Order. Husband shall have the right, at his option, to pre-pay all or a portion of the total amount of $75.000 and/or any of the five lump sum installments of $15,000, at any time before the due date thereof."

to suit the exigencies of circumstances, and his accounts were frequently subject to revision. Husband's conduct during discovery was characterized by repeated unexcused failures to produce responsive documents in his possession or control.

The court also found that Husband also engaged with his father "in financial chicanery benefitting Husband with constructive undeclared income, culminating in a scheme calculated to make it appear that Husband's income had been reduced by $48,000 shortly prior to Husband filing for divorce." This included his father executing a lease for an upscale apartment with a monthly expense of $2,569, which his father paid for. And, as the trial court found, "This arrangement between Husband and Otto Tittle is simply a constructive replacement of Husband's purportedly reduced income. There is no writing of any kind, and no credible evidence from any witness, from which any other inference could be drawn. This financial duplicity is inappropriate marital conduct." The trial court also found that Husband's "unconstrained use of the [company] 4Runner and unrestricted access to the AirEcon credit card create[s] constructive income to Husband which the Court must recognize when computing child support, [and] when determining Husband's ability to pay alimony[.]"

As the Tennessee Supreme Court has explained:

It is well-settled that an award of attorney's fees in a divorce case constitutes alimony in solido. *See* Tenn. Code Ann. § 36-5-121(h)(1) ("alimony in solido may include attorney fees, where appropriate"); *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996). . . . As with any alimony award, in deciding whether to award attorney's fees as alimony in solido, the trial court should consider the factors enumerated in Tennessee Code Annotated section 36-5-121(i). A spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses. *Umstot v. Umstot*, 968 S.W.2d 819, 824 (Tenn. Ct. App. 1997). Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses, *see Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992), or the spouse would be required to deplete his or her resources in order to pay them, *see Harwell v. Harwell*, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980). Thus, where the spouse seeking such an award has demonstrated that he or she is financially unable to procure counsel, and where the other spouse has the ability to pay, the court may properly grant an award of attorney's fees as alimony. *See id*. at 185.

*Gonsewski*, 350 S.W.3d at 113.

Here, Wife's monthly expenses exceed her income, and she lacks sufficient funds to pay her own legal expenses. *See Houghland*, 844 S.W.2d at 623. Moreover, if she were

to pay her legal expenses, she would be required to deplete her resources in order to pay them. *See Harwell*, 612 S.W.2d at 185. Accordingly, she has demonstrated that she is financially unable to procure counsel, while Husband has the ability to pay. Accordingly, we affirm the trial court's award to Wife of $75,000 to pay a portion of her attorney's fees and expenses incurred in this action.

## V.    ATTORNEY'S FEES INCURRED ON APPEAL

Husband requests that he be awarded his reasonable attorney fees incurred in bringing this appeal. Wife requests that she be awarded her attorney's fees on appeal and that Husband's request be denied.

"Whether to grant such an award is within this Court's sole discretion." *Sample v. Sample*, 605 S.W.3d 629, 640 (Tenn. Ct. App. 2018) (citing *Cain-Swope v. Swope*, 523 S.W.3d 79, 100 (Tenn. Ct. App. 2016)) (other citation omitted). In considering a request for attorney's fees, we examine "the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal . . . and any other equitable factor that need be considered." *Id.* (quoting *Cain-Swope*, 523 S.W.3d at 101–02). We also consider whether the other party has the ability to pay the requesting party's attorney's fees. *See Harwell v. Harwell*, 612 S.W.2d at 185; *see also Tippens-Florea v. Florea*, No. M2011-00408-COA-R3-CV, 2012 WL 1965593 (Tenn. Ct. App. May 31, 2012).

Here, we conclude that Husband sought this appeal in good faith, and he has prevailed on two issues while Wife prevailed on the remaining issues. We are also cognizant of the fact that the trial court awarded Wife $50,000 in the form of alimony in solido to defray the monthly deficit she will likely experience during the ten-year period of transitional alimony. Further, she was awarded an additional $75,000 to defer the bulk of the attorney's fees she incurred in the trial court proceedings. Considering these two substantial awards and concluding that neither party has the ability to pay the other's attorney's fees incurred on appeal, we deny both parties' requests for attorney's fees.

## IN CONCLUSION

The judgment of the trial court is vacated in part, affirmed in part, and this cause is remanded to the trial court for further proceedings consistent with this opinion. Two-thirds of the costs of appeal are assessed against Husband, Andrew Francis Tittle, and one-third against Wife, Deidre Lyn DeYoung Tittle.

_____
FRANK G. CLEMENT JR., P.J., M.S.